**EXHIBIT D**
**AFFIDAVIT OF SGT. WILLIAM DAVIS**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **GEORGE BERNARD,** | § | |
| ***Plaintiff,*** | § | |
| | § | |
| **v.** | § | **Case No. 4:15-cv-00734** |
| | § | |
| **CITY OF HOUSTON, HOUSTON** | § | |
| **FERDINAND RODRIGUEZ, JR.,** | § | **Honorable Gray H. Miller** |
| **EDUARDO MEDRANO,** | § | |
| **GERALD GOINES, JR.,** | § | |
| **CIRO OLIVARES,** | § | |
| **WILLIAM DAVIS,** | § | |
| **SHANTA MORTON,** | § | |
| **STEVEN BRYANT,** | § | |
| **JOHN DOE 1-3** | § | |
| ***Defendants.*** | § | |

## AFFIDAVIT OF SERGEANT WILLIAM J. DAVIS

**BEFORE ME**, the undersigned authority, on this day personally appeared Sergeant William J. Davis, for the City of Houston, Texas who being first duly sworn, upon his oath, deposed and said:

1. My name is Sergeant William J. Davis. I am a police officer with the Houston Police Department ("HPD"). In 1994 I received a Bachelor of Arts degree from Southwest Texas State University with a major in Spanish. In 1995 I applied to become a Houston Police Officer and completed Basic Peace Officer Training at the Houston Police Academy in September of 1995.

2. During my twenty (20) years of service as a Houston Police Officer I have continued my formal education. In 2003 I received a Master of Liberal Arts (MLA) degree in International Studies from the University of St. Thomas. I received a Master of Public Administration (MPA) degree from the University of Houston in 2015.

3. I am over twenty-one (21) years of age. I am of sound mind, and I have never been convicted of a felony or crime involving moral turpitude. I hereby swear that such statements contained herein are true and correct to the best of my knowledge.

## I. MY ACTIONS

4. On March 19, 2013 I was assigned as the supervisor of Squad 13 in the Narcotics Division of the Houston Police Department. I supervised Squad 13 during the execution of a no knock narcotics search warrant at 6725 Sherwood Drive in Houston, Texas.

5. Officer Gerald Goines Jr. was assigned to my squad and was working on a narcotic investigation involving reliable informant who had reported observing marijuana in the possession of Dominick Bernard at 6725 Sherwood Drive. The informant also reported that another unidentified black male suspect was also believed to have been in possession of drugs at this location. In addition to having observed marijuana, the informant reported observing a semi-auto hand gun at the location.

6. On March 19, 2013, Officer Goines submitted an affidavit for a narcotics search warrant at 6725 Sherwood Drive. The affidavit described the facts establishing probable cause to search the property and arrest Dominick Bernard. Because of the potential for destruction of drugs on the scene and in light of the semi-auto hand gun observed there, Officer Goines requested and was granted a no-knock narcotics search warrant waiving the requirement to knock and announce their presence before entering

7. Execution of a narcotics search warrant is one of the most hazardous duties a law enforcement officer can perform. No matter how much intelligence is available we are always going into an environment which might present unanticipated hazards. The Houston Police Department has specialized training for warrant execution which includes both classroom and practical exercises.

8. We decided to execute the no knock narcotics search warrant at approximately 2000 hours (8 pm) on March 19, 2016. Prior to executing the warrant I drove by the residence with Officer Goines to observe the area. At approximately 1900 hours (7 pm) all seven (7) members of Squad 13 met at the South Command Station for a briefing. Officer Goines explained his investigation and the circumstances leading up to obtaining the search warrant. He informed us that in addition to Dominick Bernard, another black male was involved in drug-related activity at the home. He also advised us of the observation of a semi-auto hand gun in the house and his reasons for obtaining a search warrant authorizing entry without first knocking and announcing our presence as police officers.

9. Officer Goines reported that there were believed to be elderly individuals living in the home. As a result of hearing this information I determined that no flash devices would be used during execution of the warrant. These devices are customarily used to stun occupants and cause momentary

confusion. The briefing covered the stack or line of officers who would be entering the home and reviewed their respective roles.

10. Squad 13 all rode together in a van to 6725 Sherwood Drive. Additional Southeast Division patrol units were requested to be in the area to help us establish a perimeter. At approximately 2025 hours (8:25 pm) we arrived at the home and executed the warrant. Officer Bryant used a "MOBY" device to break open the door and we simultaneously announced our presence as Police. The first three officers to enter the home were Officer Rodriguez, Officer Medrano and Officer Goines.

11. I was the fifth (5th) officer in the stack entering the home. Before I entered I could hear Officer Rodriguez yelling, "Police! Stop running! Police!" as he entered the house. Before I could enter the home I heard a muffled "pop" of a single gunshot. Since I was still outside the house I did not see Mr. Bernard or Officer Rodriguez at the time the shot was fired.

12. As I entered the home I observed an elderly black male and elderly black female sitting in the living room along the wall to my left. I directed them not to move and to keep their hands in the air. I checked two rooms on the South side of the residence but found no occupants. Officer Olivares was detaining a female in the bathroom near the two rooms I checked.

13. When I entered the room at the back of the residence I observed a silver colored pistol on the floor near a small piece of carpet. I saw a black male lying on his back near the pistol. This male was holding his abdomen and had apparently been shot by Officer Rodriguez.

14. While officers were attempting to render aid to the male I went outside and told the patrol officers to call for an ambulance. I also asked one of the patrol officers to take a first aid kit to the officers providing first aid. I then directed patrol officers to separate and secure the three witnesses found inside the house. Then I notified my supervisor and the Command Center that there had been an officer-involved-shooting.

15. As soon as the home had been secured from any threats and the injured male had been turned over to Houston Fire Department Emergency Medical personnel, I prepared to turn the scene over to other investigators. As soon as there was an officer-involved-shooting the house became a crime scene and my squad was directed to stand down. Narcotics Squad 15, under the supervision of Sergeant Yencha was called to the scene to conduct the search authorized in the warrant. Investigators from the Homicide Division were called to the scene to process the scene and interview the witnesses. My squad had no further contact with the three witnesses found inside the house.

16. I did not make the decision(s) on what offenses Mr. Bernard was charged with as a result of this incident. I, along with my squad, simply wrote our reports on our observations and actions and the decisions to charge Mr. Bernard were made by the Harris County Prosecutor and a Grand Jury. I was also not involved in the subsequent decision to dismiss the charges against Mr. Bernard.

## II. MY TRAINING

17. As demonstrated by my certification records attached hereto as **Exhibit D-1**, I was adequately and properly trained in the various areas of law enforcement including those issues involved in this lawsuit.

18. Specifically, I successfully completed training at the Police Academy as a Cadet. I also successfully completed the field training program. I have continually met and exceeded the annual training required by the Texas Commission of Law Enforcement Standards and Education ("TCLEOSE"). It is my understanding that HPD requires more training than that is required by TCLEOSE and I have successfully met those more stringent requirements of HPD.

19. In addition to my successful completion of HPD Academy training and the field training program, I continued training as an HPD officer. In my ten (20) years of service, I have maintained TCLEOSE training requirements, and I have received over 2,500 hours of formal law enforcement training. I achieved intermediate peace officer certification in 1997 and advanced peace officer certification in 2001.

20. I was adequately and properly trained on the various law enforcement issues relating to the subject incident. In addition to my training at the Academy and in the field training program, the following in a part of the formal or in-service training I received in the ten years prior to the incident which forms the subject matter of this litigation:

1. Narcotics Tactical Firearms Training , February 5, 2013;
2. Narcotics Diversionary Devise Flash bang Operator, January 15, 2013;
3. Decision Making and Integrity, January 14, 2013;
4. Contemporary Leadership Challenges for Major City, December 6, 2012;
5. Advanced Leadership Training – Sgt.-Lt., December 13, 2012;
6. Decision Making Integrity, November 7, 2011;
7. State and Federal Law Update, October 12, 2011;
8. Divisional Unit Updates, February 25, 2011;
9. Leadership for Superisors –Sgts. Above, January 24, 2011;
10. Officer Safety-High Risk Tactical Uniform, January 18, 2011;

11. Decision Making and Integrity-Supervisors, January 13, 2011;
12. Police Handgun Semi-Auto Pistol, January 11, 2010;
13. Strategic Response/Decision Making, January 5, 2010;
14. Strategic Response/Decision Making, September 22, 2009;
15. Decision Making and Integrity, February 5, 2009;
16. Response to Active Shooter, January 27, 2009;
17. Probable Cause, Search and Safety, January 22, 2009;
18. New Sergeant Orientation Course, March 20, 2008;
19. TCLEOSE New Supervisor Course, March 17, 2008;
20. Operational WMD Response for Law Enforcement, January 8, 2008;
21. Special Investigative Topics, October 15, 2007;
22. Narcotics Concealed Weapons, October 10, 2007;
23. Firearm Shooting Investigations, August 31, 2007;
24. Intermediate Crisis Intervention Training, May 2, 2007;
25. Prevention and Deterrence of Terrorist Acts, May 26, 2006;
26. Law Enforcement Response Actions, May 4, 2006;
27. 2006 Mandatory Tactical Training, September 1, 2005;
28. Narcotic Weapon Familiarization, February 23, 2005;
29. Narcotic Firearms Proficiency Exam, January12, 2005;
30. Narcotics Concealed Weapons, October 12, 2004;
31. Narcotics Vehicle Assault and Officer Rescue, June 10, 2004;
32. Narcotics Building Search Tactics, February 5, 2004;
33. Rolling Surveillance Techniques, November 19, 2003;
34. Narcotic Weapon Familiarization, October 16, 2003;
35. Narcotic Weapon Familiarization, May 29, 2003;
36. Officer Mandatory 2003, May 20, 2003;
37. Highway Drug Investigations, May 7, 2003;
38. Current Drug Trends, May 5, 2003;
39. Narcotics Concealed Weapons, March 25, 2003;
40. Narcotics/Reactive Shooting, July 25, 2002;
41. Narcotics Update, July 25, 2002;
42. Narcotics Concealed Weapons, March 27, 2002;
43. Narcotic Weapon Familiarization, January 14, 2002;
44. Narcotic Weapon Familiarization November 27, 2001;
45. Narcotics Update 2000, May 24, 2001;
46. Narcotics/Reactive Shooting, April 2, 2001;
47. Mandatory 2001 Day 2, April 2, 2001;
48. Mandatory 2001 Day 1, March 13, 2001;
49. Narcotics Raid Plan/Warrant Entry, February 28, 2001;

21. In addition to the above formal training, I received additional training when new procedures, new circulars, or new GOs were read, discussed, and disseminated to me. I also received training by reviewing various

training videos which were played at roll call and/or in annual in-service training.

22. At the time of the subject incident, I had been informed of and trained on the use of force, GO 600-17, dated January 4, 2008 and weapons discharges, GO 200-16, dated March 26, 2007, which were in effect at the time of this incident.

23. I also received training on GOs, circulars, and legal updates at roll call, and training videos played during roll call and/or in annual in-service training, I have also received informal training through my experiences, contacts, and discussions with other officers, sergeants and supervisors.

24. As a result of the above, I was adequately and properly trained on the issues made the basis of this suit and at the time of the incident.

## III. <u>SUPERVISION</u>

36. The Houston Police Department properly supervised Nacotics Division Squad 13 during this incident. I provided the first line of direct supervision during and at the time of the incident. First, there is a chain of command in place and this chain of command was in place at the time of the incident. Specifically, the officers report to and are supervised by police sergeants. The sergeants report to and are supervised by a police lieutenant, who reports to and is supervised by a police captain. This chain of command extends to the assistant police chief over the patrol division and higher.

37. Supervision for this shift began with roll call where information and updates are disseminated, and as discussed previously, training information may be relayed. Similarly, if any officer or sergeant has questions regarding proper procedures or what to do in certain circumstances, that officer may ask other officers, supervisors, or broadcast over the radio a need for guidance clarification or other help. Similarly, the chain of command may review the actions of HPD officers for a variety of reasons.

38. This chain of command was in place and operating at the time of the subject incident. Other means of supervision include the various disciplinary processes. If an HPD officer is found to have violated HPD policy, for example, that officer may be disciplined, up to and including termination. An HPD officer may also go through a supervisory intervention or other process in which his or her actions are reviewed. As a police officer, I am aware of these various types of discipline and/or

supervision, and I believe most HPD officers are aware that discipline will result if an officer is determined to have violated a GO. I, along with my fellow officers also understand that a complaint against an officer, be it made by a citizen, an officer, or as a regular part of a review of an incident, will be investigated. Depending on the nature of the infraction, additional supervision or discipline may result.

Sergeant William J. Davis
Houston Police Department

SWORN TO AND SUBSCRIBED before me on this 21st day of July 2016.

ARTHUR A. VALDEZ
Notary Public, State of Texas
My Commission Expires 03-25-2017

NOTARY PUBLIC IN AND
FOR THE STATE OF TEXAS

My Commission Expires: 3/25/2017