**EXHIBIT F**

**DEPOSITION TRANSCRIPT OF GEORGE BERNARD**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

GEORGE BERNARD, )
Plaintiff )
)
vs. ) CASE NO. 4:15-CV-00734
)
CITY OF HOUSTON, ET AL )
Defendant )

*****************************************************

ORAL DEPOSITION OF
GEORGE BERNARD, JR.
JULY 6, 2016

*****************************************************

ORAL DEPOSITION OF GEORGE BERNARD, Jr., produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 6th day of July, 2016, from 11:12 a.m. to 1:22 p.m., before Julie M. Silhan, Certified Shorthand Reporter in and for the State of Texas, reported by stenographic means, at the offices of City Hall Annex, 900 Bagby, 3rd Floor, Houston, Texas, pursuant to Notice, the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



INDEX


PAGE

Appearances.......................................3
GEORGE BERNARD, JR.
Examination by Mr. Carnaby....................4
Examination by Ms. Gadson....................70
Further Examination by Mr. Carnaby...........81
Further Examination by Ms. Gadson............83
Changes and signature............................84
Reporter's Certificate............................86


EXHIBIT INDEX


| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Bernard No. 1 | Photograph | 27 |
| Bernard No. 2 | Photograph | 33 |
| Bernard No. 3 | Photograph | 43 |
| Bernard No. 4 | Photograph | 45 |
| Bernard No. 5 | Photograph | 45 |




APPEARANCES

FOR PLAINTIFF:

Ms. Chareka M. Gadson
LAW OFFICE OF CHAREKA GADSON
601 Sawyer
Houston, Texas 77007
Telephone: 713/229-9997
Fax: 281/501-6777
E-mail: attorneygadson@gadsonlegal.com

FOR DEFENDANT:

Mr. Henry N. Carnaby
Ms. Malissa Wilson
CITY OF HOUSTON, LEGAL DEPARTMENT
900 Bagby, 3rd Floor
Houston, Texas 77002
Telephone: 832/393-6309
Fax: 832/393-6259
E-mail: henry.carnaby@houstontx.gov



GEORGE BERNARD, JR.,
having been first duly sworn, testified as follows:

EXAMINATION

BY MR. CARNABY:

Q. Mr. Bernard, my name is Henry Carnaby. I'm an assistant city attorney for the City of Houston. And in this matter, I'm defending the defendants which includes the City of Houston and the individual police officers that have been named in your complaint. Have you ever had your deposition taken before?

**A. No.**

Q. It's very important to listen carefully to my question, allow me to finish the question, and try to answer in an affirmative way, yes or no or with an explanation, but the court reporter has difficulty if we talk over each other or if you indicate by a nod or a gesture what your response to a question is.

I'd like to begin to talk a little bit about your background. What is your full name?

**A. George Ralph Bernard, Jr.**

Q. What is the middle name?

**A. Ralph.**

Q. How is that spelled?

**A. R-A-L-P-H.**

Q. And where do you live?

5

A. **6725 Sherwood, Houston, Texas, 77021.**
Q. How long have you lived at that address?
A. **Over about 30 years.**
Q. And were you residing at that particular address on the date of this incident back on March 19th, 2013?
A. **Yes.**
Q. Who was living with you at that address at that time?
A. **My mother and my father and my niece.**
Q. And what is your mother's name?
A. **Elizabeth Gosling.**
Q. And your father's name?
A. **Elton Gosling.**
Q. And your niece's name?
A. **Aneisha Neal.**
Q. And is this your parents' residence?
A. **Yes.**
Q. How long had Aneisha Neal been living at your parents' residence?
A. **Since about two years old or probably younger than that.**
Q. And how old was she in 2013 on the date of this incident?
A. **I don't really know.**

6

Q. Do you know how old she is today?
A. **She's twenty -- I think 24 or 25. I think 24.**
Q. Do you know how old your parents were in 2013?
A. **Huh-uh, I don't remember.**
Q. What is your date of birth?
A. **5/17/74.**
Q. And can you describe briefly your education?
A. **11th grade.**
Q. You left school in the 11th grade?
A. **And got a GED.**
Q. Where were you attending high school?
A. **Jack Yates.**
Q. I'm sorry?
A. **Jack Yates.**
Q. I apologize, but I'm having some trouble understanding you. And you say you left in the 11th grade, but you subsequently obtained a GED?
A. **Yes.**
Q. When did you obtain your GED?
A. **I forgot what year I obtained it.**
Q. Did you obtain your GED prior to the incident on March 19th, 2013?
A. **Way before that.**
Q. Have you pursued any education after you obtained your GED?

7

A. **No.**
Q. No community college, no trade schools?
A. **Huh-uh.**
Q. Were you working in March of 2013?
A. **Yes.**
Q. What was your occupation?
A. **Home health care and landscaping.**
Q. Were you working two jobs at that time?
A. **Yes. I did odds and ends with the landscaping. Whenever it's openings, I could do little jobs with my father sometimes.**
Q. In the landscaping position, who were you working for?
A. **My father, my real father.**
Q. And who is your real father that you were working for?
A. **George Bernard.**
Q. And does he have a name for his particular business?
A. **GEB Land Service.**
Q. And how long had you been working for him by 2013?
A. **Long time.**
Q. Did you work for him while you were still in high school?

8

A. **Like here and there.**
Q. Were there any other landscaping companies you worked for?
A. **No.**
Q. Who did you work for in home health care?
A. **I forgot the name of that company. It was off of Bissonnet.**
Q. What did you do in home health care?
A. **Like clean the patient's house and help them with stuff around the house and make sure they eating.**
Q. Do you have any training or certification to provide health care services?
A. **No.**
Q. And when did you begin working for the company in home health care services?
A. **I don't know the exact date.**
Q. Were you working for that company in March of 2013?
A. **Yeah, in the beginning of March.**
Q. At the beginning of March of 2013, do you know approximately how many hours per week you were working for the home health care service?
A. **About three, four hours.**
Q. Three or four hours a week?
A. **A day.**

9

Q. A day. How many days?
**A. About three days out of the week.**
Q. So no more than about 12 hours a week?
**A. Uh-huh.**
Q. Do you recall what you were paid?
**A. For every week or every two weeks?**
Q. Were you paid weekly or biweekly?
**A. Every two weeks.**
Q. All right. Do you recall approximately what you were paid on a biweekly basis?
**A. About 300. Two something, 275.**
Q. Did you ever work for any landscaping companies other than your father?
**A. No.**
Q. When did you last work in landscaping for you father?
**A. I don't know the exact date.**
Q. Were you still working in landscaping services in March of 2013?
**A. Yes.**
Q. Do you know approximately how many hours a week you were working?
**A. Every day about -- I don't know exactly how many hours, but I know it was from the morning until late in the evening.**

10

Q. Do you know any approximation of how many hours a day or a week that you were working?
**A. I'd say about from 8:00 to about 5:00 o'clock you could say.**
Q. So about nine hours a day?
**A. You could say.**
Q. Do you know how many days per week you worked?
**A. Every day.**
Q. All seven days a week?
**A. Five days.**
Q. And how were you paid?
**A. Cash.**
Q. And do you recall approximately how much you were paid per week?
**A. It varies. The job varies off and on. It be about 300 sometimes, sometimes it be more depending on how many yards we cut.**
Q. So if there was range, it would be 300 to what?
**A. To how many yards we cut.**
Q. I don't know how many yards he had on his route or how many clients he had, so can you give me any approximation of what the maximum amount you might have received?
**A. The max amount? Let me see. Say about four to 400.**
Q. 400 or 4400?
**A. 400.**

11

Q. Okay. Now you stated earlier that you worked the home health care job up until sometime early in March of 2013. Had you discontinued working that job?
**A. No.**
Q. That was just the last time that you worked?
**A. Yes, last time I worked.**
Q. And on March 19th of 2013, were you still working for your father in his landscaping business?
**A. Yes.**
Q. Were you cutting grass in March of 2013?
**A. I was, like, edge -- like, cutting bushes and stuff, like trees and stuff and bushes.**
Q. Other than the two jobs that you've described, the home health care and the landscaping work, have you worked any other jobs since high school?
**A. Yes.**
Q. What other jobs have you worked?
**A. Worked at Church's and I worked at Foley's warehouse.**
Q. What churches have you worked for?
**A. The one on OST and Calhoun. And I worked at McDonald's downtown, worked at Foley's warehouse off of 45.**

12

Q. All right. The church you described that was on Calhoun, do you know what the denomination or name of the church was?
**A. Church's. Church's Fried Chicken.**
Q. Okay. I'm sorry. And do you know how long you worked for Church's Fried Chicken?
**A. I think a year or two.**
Q. Do you know what the period was when you worked for Church's Fried Chicken?
**A. What you mean the period?**
Q. Do you know what year or month you started working for them?
**A. Been so long ago.**
Q. But it was prior to 2013?
**A. No. It was way before -- way after that. I mean before. Before 2010.**
Q. Okay.
**A. It was around high school. Around high school time. Like middle school going towards high school.**
Q. Okay. Do you know what year it was when you left high school in the 11th grade?
**A. Don't remember.**
Q. You were also describing a warehouse job that you had?

13

A. **Foley's warehouse.**
Q. Foley?
A. **Foley's.**
Q. How is that spelled?
A. **Foley's warehouse off of 45 and Scott.**
Q. And what did you do at Foley's warehouse?
A. **Like stocking. Stocking.**
Q. What kind of material were you stocking?
A. **Boxes and stuff.**
Q. And do you recall what the time period was, the dates when you worked at the warehouse?
A. **Been so long ago, I don't remember.**
Q. But that was prior to working -- excuse me -- prior to the incident in March of 2013?
A. **Huh-uh. That was prior to middle school.**
Q. Okay.
A. **Going towards high school.**
Q. In March of 2013, did you have any other form of support other than the home health care job and the work you performed landscaping for your father?
A. **No.**
Q. Have you been able to work at all since March of 2013?
A. **No.**
Q. And why are you unable to work?

14

A. **Because I can't do what I used to can do. I get short-winded when I try to do anything. Like right now when I'm talking, I'm really getting short-winded.**
Q. All right. If you need a break during this process at any time, please just ask. I don't want to make this difficult for you.
A. **Not making it difficult.**
Q. Any other limitations other than you get short-winded?
A. **There's a bunch. Too much to explain.**
Q. Okay. Well, would you please try and explain to me what physical impairments or limitations you have now?
A. **I can't hold my bowels, can't do a bunch of stuff, can't help my kids with they sports.**
Q. Can't help your kids with sports?
A. **Like I used to. Can't even wipe my butt like I used to.**
Q. Any other physical impairments that prevent you from working?
A. **Can't do what I used to do. Can't grab nothing, can't hold a person a certain way like I used to. Can't start a lawnmower, can't use a weedeater. I get short-winded.**
Q. Are you able to drive?

15

A. **A little bit. Not good.**
Q. Do you have a driver's license?
A. **Yes.**
Q. Do you have a personal vehicle?
A. **Yes.**
Q. What type of vehicle do you have?
A. **A Chevy Suburban.**
Q. You say you're able to drive, but not well. Can you describe for me what limitations you have on your driving?
A. **On my driving record?**
Q. Yeah. I'm asking what limitations -- what are you unable to do when you're driving?
A. **Sometimes turning.**
Q. Your turning is restricted?
A. **No.**
Q. All right. I don't understand. How is your driving impaired?
A. **When I drive my truck sometimes.**
Q. When you drive your truck, what impairs your driving?
A. **The turning. Turning wide. When I'm turning a corner.**
Q. And what is it about turning a corner that's difficult?

16

A. **Look at my hands. I can't grip it to turn the wheels.**
Q. All right. Do you have any equipment or modifications that assist you to drive your vehicle?
A. **No.**
Q. Are you married?
A. **No.**
Q. Have you ever been married?
A. **No.**
Q. Do you have any children?
A. **Yes.**
Q. How many children do you have?
A. **Four. Two in college and one in middle school and one elementary.**
Q. What are the names of the children in college?
A. **George Bernard and Alexis Bernard.**
Q. And what is name of the child that's in middle school?
A. **Jordan Bernard.**
Q. And the child that's in elementary school?
A. **Jeremiah Bernard.**
Q. How old are the two children that are in college?
A. **21 and 19.**
Q. Do you provide any support for them attending

17

college?
**A. Not too much. Right now I'm getting disability and I just what I can do for them. Not too much.**
Q. Do you provide any support for the child in middle school?
**A. Just what I can do.**
Q. How about the child in elementary school?
**A. Whatever I got, whatever I can do for them.**
Q. You say you're receiving disability benefits?
**A. Uh-huh.**
Q. Who are you receiving disability benefits from?
**A. What you mean who?**
Q. Who pays?
**A. Social Security.**
Q. All right. And how much are you receiving in disability benefits?
**A. 733.**
Q. Is that per month?
**A. Uh-huh.**
Q. Do you have any other source of income?
**A. No.**
Q. Who is Dominic Bernard?
**A. My brother.**

18

Q. How old is Dominic?
**A. Like 43. 43, I think.**
Q. And what does Dominic do for a living?
**A. What kind of job he got? I forgot what kind of work he do.**
Q. You don't remember what type of work he does?
**A. Don't remember.**
Q. Do you remember if he had any type of a job back in March of 2013?
**A. No, he wasn't working 2013. Not that I recall.**
Q. Do you know if Dominic has ever been arrested?
**A. Yes.**
Q. What do you know that Dominic has been arrested for?
**A. For drugs.**
Q. For selling drugs or using drugs?
**A. Selling.**
Q. Do you know what type of drugs he was arrested for selling?
**A. No.**
Q. Do you know if Dominic was ever arrested as a juvenile?
**A. I don't think so.**
Q. Has he ever been convicted of any drug-related

19

charges?
**A. Yes.**
Q. Do you know what he's been convicted of?
**A. I don't remember exactly.**
Q. Do you know when the first time Dominic was convicted or pled guilty to a drug-related charge?
**A. I can't remember when.**
Q. Was it prior to March of 2013?
**A. No.**
Q. Prior to March of 2013, had he ever been arrested for any drug-related offenses?
**A. In 2013?**
Q. Yes.
**A. I think so. I'm not for sure.**
Q. But you believe he had not been convicted of any offenses prior to March of 2013?
**A. I don't remember.**
Q. Do you know what he's been convicted of since March of 2013?
**A. Don't remember.**
Q. Has Dominic Bernard ever served any time in the state prison?
**A. Yes.**
Q. Do you know approximately when he was serving time in state prison?

20

**A. I don't remember exactly time.**
Q. Was it after March of 2013?
**A. No, I don't think so.**
Q. So he was convicted or pled guilty to something prior to March of 2013?
**A. Yeah, I think so. I'm not for sure.**
Q. Do you know what he was convicted or served time for?
**A. No.**
Q. Do you know if Dominic has ever been convicted or served time for any crime other than drug-related offenses?
**A. Huh-uh. Not that I know of.**
Q. Prior to March of 2013, had you ever been arrested?
**A. Before 2013?**
Q. Yes.
**A. I don't know exactly the day.**
Q. When do you recall was the first time that you were ever arrested?
**A. The first time? Approximately back in 2000.**
Q. And do you remember what you were arrested for?
**A. It was codeine.**
Q. Were you arrested for selling or using

21

codeine?
**A. No. One of my friends left it in my car, in the trunk.**
Q. And were you convicted of anything arising out of that arrest?
**A. Yes.**
Q. What were you convicted of?
**A. For the codeine.**
Q. Were you convicted for use or possession?
**A. Possession.**
Q. You were not convicted of any sale?
**A. What time?**
Q. I'm just asking about the arrest in 2000 or around 2000 relating to codeine that a friend left in your trunk.
**A. Yeah, I got convicted for it.**
Q. All right. I think my question was -- you testified that you were convicted of a charge of possession. My question was, was there any charge of sales?
**A. No.**
Q. Was there any fine or imprisonment as a result of a conviction?
**A. I think two days.**
Q. Was that at a city or county jail?

22

**A. County.**
Q. Do you know if the final charge was a felony or a misdemeanor?
**A. I think it was a felony.**
Q. After the arrest in 2000, have you ever been subsequently arrested?
**A. Yes.**
Q. What was the next occasion that you recall being arrested?
**A. Leaving a barbershop.**
Q. Leaving a barbershop?
**A. Uh-huh.**
Q. What happened that caused you to be arrested leaving a barbershop?
**A. They say I was attempted delivery, but it wasn't nothing. They said I was attempted delivery because I was at the wrong place the wrong time. When I left the barbershop, they pulled me over.**
Q. Attempted delivery of what?
**A. Cocaine.**
Q. And were you convicted of anything arising out of that incident?
**A. Yes.**
Q. And do you know what you were convicted of?
**A. Uh-huh.**

23

Q. What was the conviction for?
**A. They said attempted delivery.**
Q. Was that a felony or misdemeanor?
**A. A felony.**
Q. And did you serve any time or pay any fine for that offense?
**A. I served a couple days and got probation.**
Q. Was that time in the county jail or city jail?
**A. County.**
Q. And what was the term of your probation? How long did it last?
**A. Ten years.**
Q. And was there any violation during your probationary period?
**A. Yes.**
Q. What was the reason for the violation during probation?
**A. The wrong place the wrong time, one of my friend's house.**
Q. And were you charged with anything as a result of being in the wrong place at the wrong time?
**A. Yes.**
Q. What, if anything, were you charged with?
**A. It was cocaine.**
Q. And were you charged with possession or sale?

24

**A. Possession.**
Q. And what was the disposition of that particular arrest?
**A. Five years.**
Q. You had a conviction and you had to serve a period of five years?
**A. Yes.**
Q. And was that in the state penitentiary?
**A. Yes.**
Q. And what was the time period that you served in the state penitentiary?
**A. Two years.**
Q. What were the dates? From when did you go in and when did you come out?
**A. '05 to -- like the middle of '05 to '07.**
Q. After you were released from prison in 2007, were you placed on parole for a period of time?
**A. Yes.**
Q. What was the period of parole?
**A. Three years.**
Q. And was that parole ever violated?
**A. No.**
Q. After being released from prison in 2007, were there any additional arrests?
**A. No. Till this time.**

25

Q. Prior to the incident in March of 2013, there were no additional arrests?
**A. Huh-uh, until 2013.**
Q. Have you ever been arrested for anything other than a drug-related charge?
**A. No.**
Q. Have you ever been arrested after March of 2013, excluding the incident that we're talking about?
**A. No.**
Q. Who was home at the -- at your parents' residence on the night of March 19th, 2013?
**A. My mother, my father and me and my niece.**
Q. Do you know about approximately what time the police came to your home?
**A. I don't remember what time.**
Q. Do you recall if it was in the afternoon or the evening?
**A. Like late in the afternoon.**
Q. Was it dark outside at the time they came?
**A. It was getting dark. It was getting dark. About 8:00, something like that, 7:00.**
Q. Where was your mother at the time the police arrived?
**A. Sitting on the couch.**
Q. What room was the couch located in?

26

**A. In the living room.**
Q. And what, if anything, was she doing?
**A. Watching TV with me and my father.**
Q. Where was your father at the time the police arrived?
**A. He was sitting on the couch, too, right on the side of her.**
Q. And what was your father doing?
**A. Watching TV, too.**
Q. And where were you located at the time the police arrived?
**A. On the couch -- on the floor beside.**
Q. When the police first arrived, where were you located?
**A. Like, where the dining room table is.**
Q. Were you standing?
**A. I was walking towards the kitchen. I was sitting on the couch at first before they even came and I walked toward the kitchen. And when they came through the door, I was right there by the dining room table.**
Q. What door did the police enter through?
**A. The front door.**
Q. Where was the front door in relation to where you were walking?
**A. Right in the middle.**

27

Q. The front door enters into the dining room?
**A. No. It's the front room. It's like the living room and then the dining room is right by each other.**
Q. So the front door enters into the living room. And then, it continues to the dining room. And then, behind that is a kitchen?
**A. Uh-huh.**
Q. And the officers came in the front door into the living room?
**A. Uh-huh.**
Q. And you were walking with your back turned to them towards the kitchen, but in the dining room?
**A. Yeah. When I got to the dining room, that's when I turned around and that's when they shot me.**
Q. Did the police say anything when they entered the home?
**A. No.**
Q. When you turned around, did you identify them as police officers?
**A. They had on masks and guns.**
Q. Did they have anything which indicated that they were police officers?
**A. They uniform.**
**(Bernard Exhibit No. 1 was marked.)**

28

Q. (By Mr. Carnaby) I'm showing you a picture that was taken. Do you recognize where this picture was taken?
**A. In the living room.**
Q. And in this picture that's Exhibit 1 is a Houston police officer. Were the officers who entered the home dressed in a fashion similar to the way this officer is dressed?
**A. Uh-huh.**
Q. So you're able to read "police" across the vest that he's wearing on his chest?
**A. Yes.**
Q. Says "police" on arm bands on both of his arms?
**A. Uh-huh.**
Q. And you can make out "police" running up and down the sides of each arm?
**A. Yes.**
Q. Any doubt in your mind when you turned around that those were Houston police officers?
**A. They say "freeze." When they said "freeze," I threw my hands up and that's when I got shot, so I really couldn't see too much, because soon as I turned around, they said "freeze," I turned around and I threw my hands up and they shot me.**

29

Q. All right. So the officers were --
**A. It happened so fast.**
Q. All right. The officers who entered the home, you recall that they said "freeze"?
**A. Uh-huh, yes.**
Q. Did they say anything other than the word "freeze"?
**A. It happened so fast.**
Q. Do you recall them saying anything other than the word "freeze"?
**A. No. They say "freeze," that's when I turned around.**
Q. And when you turned around, where were your hands located?
**A. Going straight in the air. When I turned around, I threw my hands in the air. As soon as I threw my hands up, I'm getting shot flying through the door.**
Q. Did you raise your hands before you turned around?
**A. As I was turning around, I threw my hands up.**
Q. You heard someone say "freeze" --
**A. Boom, hit the door.**
Q. Please just let me finish the question, okay? You heard someone say freeze, but you turned around; is that correct?

30

**A. Yes.**
Q. You say you were raising your hands as you were turning?
**A. Uh-huh.**
Q. Did anyone instruct you to raise your hands?
**A. No. That's the best thing to do.**
Q. It was your decision to raise your hands as you were turning?
**A. Yeah, so they wouldn't shoot. Because you have your hands down, any police officer they'll think you have -- you fixing to pull something on them.**
Q. Okay. And when you turned around as you were raising your hands, an officer shot you?
**A. Yes.**
Q. How many shots did the officer fire?
**A. Didn't take but one shot.**
Q. How many officers were in the living room at the time you turned around and the officer fired one shot?
**A. I don't know how many. It happened so fast.**
Q. Could you see any other officers other than the officer who fired the shot?
**A. It happened so fast, I couldn't react to nothing.**
Q. Any idea how much time passed between when the

31

officers first entered and you heard someone yell "freeze" and the shot was fired?
**A. Repeat that, sir.**
Q. Do you have any idea how much time passed between the officers entering the home, you hearing somebody say "freeze" and the shot was fired?
**A. Like I said, it happened so fast. When they came to the door and I heard the boom and the "freeze," soon as I turned around, when I turned around I'm getting shot. It happened too fast. They didn't give me a chance to say nothing, do nothing. They just came in and shot.**
Q. One officer fired one shot?
**A. Yes.**
Q. And what happened to you after you were shot?
**A. I flew through the door. And when I flew through the door, I'm telling the law man I'm about to die. He say, "You ain't about to die," and he threw me over.**
Q. You say you flew through the door. What door did you fly through?
**A. The door like where the dining room table is, it's a slide door right there. It was halfway open and I broke the door going through it.**
Q. You describe it as a sliding door. Is it like

32

a pocket door that goes into the wall?
**A. Uh-huh.**
Q. And was the door closed or open?
**A. Halfway open.**
Q. And what damage did you do to the door when you hit the door?
**A. Knocked it down, knocked it off track.**
Q. Knocked it entirely off the track?
**A. (Nods head.)**
THE COURT REPORTER: I need a verbal response.
**A. Knocked it out.**
Q. (By Mr. Carnaby) And what did you say the officer did as you fell through the door?
**A. He threw me over. I kept on saying, "I'm about to die," holding my stomach. He just threw me over.**
Q. What did the officer throw you over?
**A. He threw me over to my other side, because I was laying on my back and he threw me over, told me, "You ain't fixing to die."**
Q. Where was it that you fell?
**A. Through the door on my back. Had my back to the door and when they shot me, I went straight through the door.**

33

Q. All right. And you landed on the floor of the kitchen?
**A. Yes.**
Q. And you were initially laying on your back?
**A. Yes.**
Q. And the officer turned you over?
**A. Uh-huh.**
Q. Did the officer do anything else?
**A. He just turned me over. I was holding my stomach. I couldn't go nowhere, do nothing. He just going to throw me over, tell me turn over and trying to put handcuffs on me.**
Q. Was he able to put handcuffs on you?
**A. I don't remember after that, because I kind of -- I blanked out. I must have died right then and there. After that, I don't remember nothing else after that.**
**(Bernard Exhibit No. 2 was marked.)**
Q. (By Mr. Carnaby) Mr. Bernard, I'm showing you deposition Exhibit No. 2. Can you identify what that photograph shows?
**A. The dining room.**
Q. Whoever the individual that took this photograph, would he have been standing inside the home in the living room?

34

**A. What you mean?**
Q. Where would -- from the perspective we're looking at, where is the person who's holding the camera? Where would he be standing in the home?
**A. Back this way.**
Q. Would he be standing in the living room area taking a photograph of the dining room towards the kitchen door?
**A. Yeah.**
Q. So that door we see at the back of this photograph is the door to the kitchen?
**A. Yeah.**
Q. And at the time you were walking towards the kitchen, how close to the door were you in the dining room?
**A. I was like right up in here.**
Q. It's hard for the court reporter to indicate that. Were you close to the kitchen door?
**A. I was a little bit close to the kitchen door.**
Q. And that door was, I think you testified before, about half open?
**A. Yes. Half open, yeah.**
Q. And it slides on the track and goes into the wall?
**A. Yeah.**

35

Q. Does it open from the left or the right in this photograph?
**A. It open from the left.**
Q. So the door is on -- you see a breakfront that's on the left-hand side of the dining room?
**A. Uh-huh.**
Q. Is that the side the door is stored in the wall, behind that?
**A. Yeah.**
Q. Okay. And then, you fell into the area of the kitchen just beyond that?
**A. Uh-huh.**
Q. Does this photograph show the position of all the furniture and items that were in the dining room?
**A. Yeah.**
Q. You said that the officer turned you over and attempted to place handcuffs on you.
**A. Uh-huh.**
Q. You don't remember if he was able to place handcuffs on you?
**A. No.**
Q. What, if anything, happened after that?
**A. Don't remember.**
Q. Did you lose consciousness?
**A. Uh-huh.**

36

Q. She can't take that down.
**A. Yes. I guess that's when I died then.**
Q. Do you recall when you next gained consciousness?
**A. No.**
Q. Do you know if the officers at the scene attempted to provide any medical assistance to you?
**A. No.**
Q. Do you know how long it took before the firefighter, paramedics or EMT arrived at the scene?
**A. They told me it took a long time to arrive there.**
Q. But you were unconscious. You don't know how long it took.
**A. No.**
Q. Do you remember any of the care that you were given by the representatives of the fire department?
**A. No.**
Q. Do you remember being transported to the hospital?
**A. No.**
Q. Do you remember any of the care that you initially received at the hospital?
**A. No.**
Q. When was it that you recall regaining

37

consciousness?
**A. About two month and a half after then.**
Q. So you believe it was approximately two months before you regained consciousness?
**A. That I knew where I was really exactly at.**
Q. Do you have any recollection of any events that occurred after you were shot before two months later?
**A. Repeat yourself. I don't understand.**
Q. I'm sorry. That may not have been clear. From the time you lost consciousness in the kitchen, you're saying, I think, that it was about two months before you really knew what was going on.
**A. Yeah, after.**
Q. My question is: When after the incident after you lost consciousness, when is it that you have your first memories of anything happening subsequent to that?
**A. I don't remember.**
Q. Do you recall any pain at the time you were shot?
**A. Yes.**
Q. Do you recall any pain during the time that you received treatment?
**A. Yes.**
Q. When do you recall experiencing pain during

38

your treatment?
**A. When I came back -- when I came conscious.**
Q. Was that prior to two months after the incident?
**A. Yes.**
Q. Your complaint indicates that you lost some of your fingers and toes as a result of this incident.
**A. Yes.**
Q. How many fingers did you lose?
**A. Nine.**
Q. And which nine fingers did you lose?
**A. All of my left hand and four on my right hand.**
Q. And did you lose any of your toes?
**A. Yes.**
Q. How many toes did you lose?
**A. Six. Three off each toe (sic).**
Q. And which toes did you lose on each foot?
**A. The first three.**
Q. Starting with the big toe?
**A. Uh-huh.**
Q. The same on both feet?
**A. Yes.**
Q. What was your understanding of the reason why you lost fingers and toes as a result of this incident?
**A. Getting shot, lost a bunch of blood.**

39

Q. Any explanation other than that that's been provided of why you lost fingers and toes as a result of being shot?
**A. Any what?**
Q. Any other explanation that anybody has ever provided to you to explain why it was necessary to amputate fingers and toes?
**A. Because the blood wasn't circulating to it from me being shot.**
Q. Was that a result of the gunshot or a result of the treatment that you were provided?
**A. From the gunshot.**
Q. Was it the result of any drug or medicine that you were provided during the treatment process?
**A. Not that I know of.**
Q. Prior to March 19th of 2013, had you ever been diagnosed with any sort of a medical condition?
**A. No.**
Q. Had your ever been diagnosed as having diabetes?
**A. No.**
Q. Did you have a regular doctor that you would see?
**A. No.**
Q. Did you get regular health care at all during

40

the period prior to 2013?
**A. Before 2013?**
Q. Prior to March of 2013, did you have any regular health care? Did you see a doctor annually?
**A. Not every -- not annually, but like -- not annually, but I seen a doctor.**
Q. What do you recall having seen a doctor for prior to March of 2013?
**A. Checkup.**
Q. Do you know who the doctor was or doctors were that you saw prior to March of 2013 for checkups?
**A. No.**
Q. Did you ever receive any treatment in any emergency room?
**A. No.**
Q. Any treatment in an urgent care clinic or similar clinic that provides walk-in treatment?
**A. Like a little clinic walk-in -- like a little clinic?**
Q. Yes.
**A. Yeah.**
Q. What type of treatment did you receive?
**A. Probably going like for -- just for a checkup.**
Q. So other than checkups, you never had any occasion where you went in for a broken bone or because

41

you were sick to try to get some medicine?
**A. No. That's all the kids with broken bones.**
Q. Did you break any bones when you were a kid?
**A. Yeah.**
Q. What did you break?
**A. Collarbone.**
Q. I know that one. Broke mine three times. When did you break your collarbone?
**A. In elementary.**
Q. Just once?
**A. Yes.**
Q. Any other broken bones?
**A. A smashed toe.**
Q. And when did that occur?
**A. I was in elementary, too.**
Q. And do you recall where you received treatment for the broken collarbone?
**A. No, huh-uh.**
Q. Do you recall where you were treated for the smashed toe?
**A. No.**
Q. Any other broken bones or incidents?
**A. No.**
Q. Did you play any sports in high school?
**A. Yes.**

42

Q. What did you play?
**A. Baseball and track.**
Q. Have any injuries playing baseball?
**A. No.**
Q. Any injuries running track?
**A. No.**
Q. What position did you play at baseball?
**A. Pitching and back catching.**
Q. And what events did you compete in in track?
**A. Sprint relay and 200-yard dash.**
Q. Any field events?
**A. No.**
Q. Any cross country?
**A. Huh-uh.**
Q. On March 19th of 2013, do you know if there were any firearms in the residence where you were living?
**A. Yes.**
Q. What firearms do you recall were in the home at that time?
**A. 12 gauge in the washroom.**
Q. There was a 12 gauge shotgun that was kept in the washroom?
**A. Uh-huh.**
Q. Where was the washroom?

43

**A. Over here.**
Q. Okay. You're showing what we marked as deposition Exhibit No. 2 and there's a fan and a breakfront on the left and it looks like there's a doorway.
**A. Yeah.**
Q. Is that the doorway to the washroom?
**A. Yeah.**
Q. And where in the washroom would the shotgun be kept?
**A. In the corner behind the door, way in the back.**
**(Bernard Exhibit No. 3 was marked.)**
Q. (By Mr. Carnaby) I'm showing you what we've marked as Exhibit No. 3. Is that the shotgun that we've been talking about during the deposition?
**A. Yes.**
Q. And it looks like it's in a corner behind the door the way you described it. Is the door that we see on the left, is that the door to the dining room or is that the door to another room from the washroom?
**A. That's the washroom door.**
Q. All right. So this shotgun is behind the door up against a wall and on the other side of the wall would be the dining room?

44

**A. On the other side of the wall, yes.**
Q. Who owns the shotgun?
**A. My brother.**
Q. And this is a shotgun, it's not a rifle?
**A. Whatever it is, rifle.**
Q. You testified it's a 12 gauge. A 12 gauge would be a shotgun.
**A. I guess it's a rifle.**
Q. You think it's a rifle now?
**A. I don't know what it is.**
Q. Do you know the difference between a shotgun and a rifle?
**A. Huh-uh.**
Q. All right. But you believe that this is a 12 gauge?
**A. Might not be.**
Q. And did your brother live with your parents at that time?
**A. No.**
Q. Why would your brother have a shotgun at your parents' home?
**A. I have no idea.**
Q. Did your parents know that he kept a shotgun in their home?
**A. I have no idea.**

Q. Were there any other firearms in the home?
**A. No.**
**(Bernard Exhibit No. 4 was marked.)**
Q. (By Mr. Carnaby) Have you ever seen that handgun before?
**A. No.**
Q. Do you recognize the area where the picture is taken?
**A. No. What is that?**
Q. To your knowledge, you have no knowledge of this handgun being in your parents' home on March 19th of 2013?
**A. No.**
Q. Do you have any knowledge of anybody owning a firearm that uses 9-millimeter ammunition?
**A. No.**
Q. Had you ever seen any 9-millimeter ammunition in your parents' home?
**A. No. What is -- I ain't never seen this.**
Q. I understand. Exhibit 4, you say you've never seen that handgun before; is that right?
**A. That's right.**
Q. Okay.
(Bernard Exhibit No. 5 was marked.)
Q. (By Mr. Carnaby) Have you ever seen what's



depicted in Exhibit No. 5 before?
**A. This just a BB gun.**
Q. All right. Who does this BB gun belong to?
**A. My brother.**
Q. Do you know where that BB gun was kept in your parents' home?
**A. Yes.**
Q. Where was it kept?
**A. In the kitchen on the side of the TV.**
Q. Now, in this photo that we've marked as Exhibit No. 5, is that the TV we see near the front of the gun, the barrel of the gun?
**A. No. It's on the wrong side.**
Q. Okay. It was normally kept on the other side?
**A. Yeah, on the other side of the TV in the back.**
Q. And it also looks like there's a canister of what appear to be BBs. Would that be where that was normally kept?
**A. No.**
Q. Do you know why your brother kept a BB gun behind the television in the kitchen in your parents' home?
**A. No.**
Q. Were your parents aware of the fact that he kept a BB gun there?



**A. Not that I know of.**
Q. Were you aware of the fact that he kept the BB gun there?
**A. Yes.**
Q. Your brother ever tell you what the purpose of having a BB gun at that location was?
**A. No.**
Q. On March 19th, of 2013, did you have any drugs at your parents' home?
**A. No.**
Q. Do you know if your brother kept any drugs at your parents' home?
**A. No.**
Q. How about in areas outside your parents' home?
**A. No.**
Q. Would there have been -- did you have any drugs that you kept on the property at your parents' home?
**A. No.**
Q. Do you know if your brother kept any drugs on the property at your parents' home?
**A. No.**
Q. Are you familiar with a complaint that has been filed in this case against the City of Houston and other defendants?



**A. Repeat yourself. I couldn't hear you.**
Q. Are you aware of the complaint -- have you ever reviewed the complaint that was filed on your behalf against the City of Houston and the Houston police officers who were named in the complaint?
**A. Huh-uh.**
Q. There's a statement in the complaint that no drugs were found on the scene. Do you have any knowledge of whether any drugs were found on the scene?
**A. No, because I knew there wasn't no drugs in there.**
Q. There's a statement in the complaint that witnesses overheard defendant officers discussing their search not revealing anything. Do you know who overheard any of the officers discussing the search?
**A. No.**
Q. The complaint alleges that the officers planted or identified drugs that were not, in effect, at your parents' home. Do you know which officers planted drugs and reported that they were found at your parents' home.
**A. No.**
Q. Do you know which officer reported finding drugs at your parents' home?
**A. No.**

Q. Do you know whether any of the officers who have been named in the complaint, which are Officers Ferdinand Rodriguez, Jr., Eduardo Medrano, Gerald Goines, Jr., Ciro Olivares, William Davis, Shanta Morton, or Steven Bryant, do you know if any of those officers ever reported finding drugs during the execution of the search warrant at your parents' home?
**A. No.**
Q. You testified earlier that one officer fired one shot while you were turning around in the dining room.
**A. Yes.**
Q. And you believe that officer was Ferdinand Rodriguez, Jr.?
**A. They said that was him that fired it, because all of them had on masks when they came in, so I couldn't tell who was who.**
Q. To your knowledge, only one shot was ever fired?
**A. Yes.**
Q. And other than the officer who turned you over and attempted to put handcuffs on you, did any other officer use any force directed at you?
**A. No.**
Q. Do you know if the officer who turned you over



and attempted to put handcuffs on you was the same officer who shot you?
**A. I don't know, it happened so fast.**
Q. To your knowledge, did any of the other officers who have been named as defendants in this case use anything that you contend was unreasonable or excessive force?
**A. Coming in without acknowledging they self.**
Q. Not knocking on the door and announcing themselves?
**A. Uh-huh.**
Q. Other than not knocking on the door and announcing themselves and other than the testimony with regard to the officer who shot you and the officer who turned you over, do you have any reason to believe that any of these other officers other than Ferdinand Rodriguez ever used excessive force?
**A. I don't understand.**
Q. I'm just trying to ask other than what you have said, that they didn't knock, that they didn't announce themselves prior to entering.
**A. And they came in and shot.**
Q. One officer shot you, one officer turned you over and attempted to put handcuffs on you, and you're not sure whether he was ever able to do so.



**A. Uh-huh.**
Q. Do you have any personal knowledge of any other officer taking any action that you allege was excessive force?
**A. Not that I know of. I don't remember half -- it happened so fast, I don't remember.**
Q. And you don't know who the officer was who reported having found drugs at the home or on the property?
**A. No.**
Q. And you don't know whether any of the officers who are named in your complaint reported finding drugs at the home or on the property?
**A. No, because I stayed in the hospital before they even filed a charge of anything, so my mother didn't even know nothing about it. Just all of a sudden just came up about two months later. They said something been found, but I didn't understand.**
Q. Now, unless I misunderstood you, you don't have a clear recollection of what happened for about two months after this incident.
**A. No. I blanked out right there on the scene.**
Q. You were taken to a hospital for treatment?
**A. Yes.**
Q. What hospital were you taken to?



**A. Ben Taub.**
Q. The main hospital?
**A. Uh-huh.**
Q. In the medical center?
**A. Yes. Because I guess when I blanked out, they say I died right there on the scene. They brought me back, but when I get to the hospital I died again.**
Q. Who said you died at the scene?
**A. My mother, because she said she kept on telling them to call the ambulance and they wouldn't never call the ambulance. They took they time to call the ambulance. The -- what you call them? When you die on the scene, the coroners came, and she didn't know what was going on.**
Q. All right. Now, you're testifying not of your personal knowledge, but what you understand from your mother?
**A. Yes.**
Q. Are you saying that your mother told you that the coroner arrived before the ambulance arrived?
**A. I think so.**
Q. You're not sure whether your mother told you that?
**A. Yeah, she say the coroner people come out when somebody die. They came out on the scene, so she didn't**

53

**know what was going on.**
Q. Okay. But my question was, did your mother tell you that the coroner arrived at the scene --
**A. Yes.**
Q. -- before the Houston Fire Department's ambulance arrived at the scene?
**A. Yes. Or they rode the same time.**
Q. You don't have any personal knowledge of how long it took -- let me start again.
You don't have any personal knowledge of whether the officers at the scene promptly attempted to provide care to you?
**A. No.**
Q. You don't have any personal knowledge of whether the officers at the scene promptly summoned an ambulance from the Houston Fire Department?
**A. Huh-uh.**
Q. And you don't have any personal knowledge whether the officers at the scene delayed in any way transporting you to the hospital for treatment?
**A. No.**
Q. Now, you said your mother told you that you had died at the scene.
**A. Uh-huh.**
Q. And then, you were saying that someone told

54

you that you had died again later.
**A. Uh-huh.**
Q. Who told you that you died again later?
**A. The doctor at the hospital.**
Q. Who was the doctor that told you that?
**A. I don't remember. They told me I was lucky.**
Q. You don't remember who the doctor was who told you that you died again?
**A. Huh-uh.**
Q. Is that the wording that he or she used to describe what happened?
**A. Yes. The doctors at the hospital, when I came to know what was going on, they told me that I had died twice and I was lucky to be here. They didn't think I was going to make it.**
Q. To the best of your knowledge, whoever the doctors were that told you that you had died twice told you that approximately two months after the incident?
**A. Uh-huh. When I came to know where exactly where I was at, because my mother say I came, but I kept -- I wasn't really there.**
Q. Who were the officers that you allege falsely arrested you?
**A. I don't understand.**
Q. The first count of your complaint you allege

55

false arrest. Defendant officers unlawfully detained and falsely arrested you. Who were the officers that did that?
**A. I still don't understand what you're saying.**
Q. Do you know who the officers were who arrested you?
**A. Arrested me when?**
Q. Arrested you on March 19th, 2013 at your parents' home.
**A. The day of the shooting?**
Q. I'm sorry?
**A. The day of the shooting?**
Q. Yes.
**A. I didn't get arrested.**
Q. When, to your knowledge, were you arrested?
**A. I wasn't arrested till about three months after the incident. They said I had a warrant for my arrest.**
Q. How were you contacted three months after the incident?
**A. When I got out the hospital.**
Q. And who were the officers who told you three months after the incident that they had a warrant for your arrest?
**A. I don't remember.**

56

Q. Do you know whether a warrant had been issued for your arrest?
**A. We didn't know, because we had the lawyer on top of it, but it wasn't -- it didn't -- warrant didn't come up til two or three months later after the incident. That's why we didn't understand it.**
Q. All right. You're saying that you were arrested two or three months after the incident?
**A. I wasn't ever arrested, period.**
Q. Okay.
**A. We had to get non arrest bond.**
Q. So you were taken for treatment, but you were never physically arrested?
**A. No.**
Q. They told you they had obtained a warrant for your arrest?
**A. Uh-huh.**
Q. And they allowed you to obtain a non arrest bond?
**A. Uh-huh.**
Q. You were never physically arrested?
**A. No.**
Q. Were you ever imprisoned?
**A. No.**
Q. There was no time at which they restrained

57

your liberty or your ability to move about? They never took you into custody?
**A. No. I did a non arrest bond, so I didn't have to go through all that.**
Q. Okay. So just so I understand the procedure as you understand it, you were advised that a warrant had been issued?
**A. Uh-huh.**
Q. Before anybody physically arrested you, you obtained a bond that allowed you to be released on bond pending whatever criminal charges were pending?
**A. Yes, because they -- my mother said they came up there and put handcuffs on me on the bed in the hospital.**
Q. Okay. But you're not aware of that?
**A. No.**
Q. To your knowledge, you were never physically arrested?
**A. No.**
Q. And to your knowledge, you were never taken to a jail or held for any period of time?
**A. No.**
Q. Do you know which individual officer failed to tell the district attorney that drugs were not found during the search at your parents' home?

58

**A. No.**
Q. Do you know which officer you contend generated a report that falsely indicated whether drugs were found?
**A. No.**
Q. Do you have any knowledge of whether any of the officers you've named as defendants in this case were involved finding or reporting finding any drugs at your parents' home?
**A. No, because there wasn't no drugs there.**
Q. Do you have any knowledge of whether any of the officers that you have named in the complaint in this case were involved conveying information to the district attorney in order to obtain a warrant for your arrest?
**A. Don't understand what you're saying.**
Q. The allegation is that when a warrant was obtained, somebody failed to tell the district attorney that no drugs were found, that somebody falsely reported that drugs were found at the time the search warrant was executed. My question is, do you have any knowledge of which, if any, of the individual officers named made that false report or failed to disclose that there were no drugs found?
**A. No.**

59

Q. Your complaint alleges a conspiracy to commit constitutional violations. Do you know which individual officers conspired?
**A. No.**
Q. Do you know when they conspired?
**A. Huh-uh.**
Q. You allege that there was an agreement not to report that drugs were not found at the residence. Do you know which officers entered into that agreement?
**A. No.**
Q. You've alleged that there was an agreement to generate reports and other documents omitting material facts relating to the arrest and search and containing falsities. Do you know which officers entered into that agreement?
**A. No.**
Q. You allege that officers failed to intervene to prevent violations of your constitutional rights. A short time ago you described the events that occurred when the officers entered the home.
**A. Uh-huh.**
Q. You said that everything happened very quickly.
**A. Uh-huh.**
Q. How would any of the officers other than the

60

officer who fired the shot have been able to intervene to prevent you from having been shot?
**A. They couldn't. It happened so fast. I guess the first police officer that came in the door, I guess he just first one that seen me and first one that shot.**
Q. Your complaint alleges that there was an incident shortly after you were released from the hospital where you were legally detained by Houston police officers. Do you know when that event occurred?
**A. I don't know when exactly date it occurred.**
Q. Tell me what, if anything, happened.
**A. After the -- me getting out the hospital?**
Q. Yes. What happened when you had contact with the police where you allege you were illegally detained?
**A. I wasn't ever detained. I don't understand.**
Q. Okay. Let me just read you from the complaint and then we can just ask what you know about this. In paragraph 22 of your complaint, it says, "Also, Mr. Bernard was subjected to unreasonable harassment and searches. Shortly after being released from the hospital, Mr. Bernard was illegally detained by defendant officers who were stalking him to question him about the events that took place on the day he was shot. After being pulled over and ordered to step out of his vehicle, he was roughly searched while wearing a

61

colostomy bag.
"Due to how roughly defendant officer was searching the area of the colostomy bag, Mr. Bernard requested the officer to be careful, but it was hastily disregarded. Mr. Bernard was then approached by a masked police officer who aggressively questioned him regarding what he remembered about the night Mr. Bernard was shot. Mr. Bernard describes the costumed police officer as a male of Hispanic descent."
Do you recall those allegations in your complaint?
**A. Yes.**
Q. Do you recall when that incident allegedly took place?
**A. I don't know exactly date, but it was on South Main. I was driving on South Main and it was a car behind me and the police was behind that. They behind the other car and the police went around the other car and hit the siren and pulled me over, and I was thinking he was fixing to pull the car over that's behind me and he pulled me over.**
**When he pulled me over, he told me to get out the car. He didn't ask for no license, no insurance, so I really didn't know what was going on until he start searching me, asking me questions. And he kept on**

62

**looking at me in my eyes talking about, "You remember me?" I said, "I don't remember you." He said, "You remember me," talking about, "I was over there when you got shot." I said, "When I got shot?"**
**And he said, "Come here," and he took me in the back and put me in the back of the police car. That's when he raised the window down and started asking me questions, talking about, "Can you tell me what happened that day that you got shot?" I said, "No, I don't want to talk about that day. All that day did is lost my hands behind that day." And he kept on asking me questions.**
Q. The officer who stopped you, you don't know when the date was. It was sometime after you were released from the hospital?
**A. Yes.**
Q. What is the reason you have for believing that the officers were stalking you?
**A. Because he didn't ask me no license, insurance. And when he pulled me over, he had -- one police in the car had a mask on, and the other one, he didn't.**
Q. Other than the fact that they didn't ask you for your license and insurance, and the fact that one of the officers was wearing a mask, what makes you believe

63

that they were stalking you?
**A. Because they tore my truck up talking about is there drugs. I say, "There ain't no drugs in my truck."**
Q. I'm not sure I understood you. They towed your truck or they tore --
**A. They tore my truck up searching it.**
Q. Did they ask you for consent to search the truck?
**A. They didn't ask nothing. Didn't ask for no license, no insurance. I asked them what's the reason for pulling me over. They didn't tell me nothing.**
Q. The officer who was not wearing a mask, was he wearing a Houston police officer uniform?
**A. Yes.**
Q. Do you recognize who he was?
**A. No.**
Q. Do you recall ever having seen him before?
**A. No.**
Q. Now, when he spoke to you, he didn't indicate that he was the officer who had shot you?
**A. No. He say he was over there.**
Q. So he said he was someone who was there that night?
**A. Yeah. And I was asking him who exactly who he was, but he wouldn't tell me.**

64

Q. Did the officer who was wearing a mask say anything to you?
**A. No.**
Q. He never questioned you?
**A. No.**
Q. Just the other officer?
**A. Yeah.**
Q. Were you ever handcuffed?
**A. No.**
Q. Were you arrested?
**A. No.**
Q. Do you know if on the same date of this incident if your brother was arrested?
**A. Yes.**
Q. Had you seen your brother prior to being stopped?
**A. No.**
Q. Where was your brother arrested?
**A. He was on South Main.**
Q. And you were stopped on South Main?
**A. Yes.**
Q. You were by yourself in the vehicle?
**A. No.**
Q. Who was with you in your vehicle?
**A. One of my friends.**

65

Q. Who was the friend?
**A. Al Smith.**
Q. And your brother was also on South Main, but he was not in your vehicle?
**A. Huh-uh.**
Q. Was he in a different vehicle?
**A. Yes.**
Q. Was he by himself or with someone else?
**A. He was by himself.**
Q. Had you been with your brother before the traffic stop?
**A. No.**
Q. You just both happened to be at the same location at the same time?
**A. Uh-huh.**
Q. Did you see him stopped?
**A. No.**
Q. Did you see him arrested?
**A. Yeah.**
Q. How far away was his traffic stop from your traffic stop?
**A. I'd say about a block or two.**
Q. And you hadn't seen your brother prior to that?
**A. Earlier.**

66

Q. How much earlier?
**A. It was early that morning.**
Q. And what time was the traffic stop?
**A. I have no idea what time it was.**
Q. I'm sorry. I'm going to need just a second. These report forms show a lot of entry dates and I want to look for the date of the traffic stop.
Do you know whether the date of this incident might have been February 10th, 2014?
**A. I don't remember what date it was.**
Q. That's almost a year after the incident in March of 2013. Do you recall that there was an earlier traffic stop?
**A. Huh-uh.**
Q. Could the time of the incident have been approximately 6:41 p.m.?
**A. I don't remember what time it was.**
Q. Do you recall how long it had been since you saw your brother the morning of this traffic stop?
**A. I don't remember exactly what time. I know it was earlier that morning.**
Q. And when you saw your brother stopped on South Main about a block away from where you were at, was that while you were being stopped by the police?
**A. I guess so.**

67

Q. So both of these traffic stops happened at the same time?
**A. I don't know. I don't think so.**
Q. Okay. Was -- was he stopped before --
**A. Probably so.**
Q. -- you were pulled over?
**A. Probably so. Not for sure.**
Q. Could it have been after you were pulled over?
**A. Not sure.**
Q. So you're not sure you even saw him while you were talking to or dealing with the officers?
**A. No, I ain't seen him. I was riding with my friend. He say he seen him, but I didn't see him.**
Q. Now, you've already testified that the officers did not arrest you.
**A. Huh-uh.**
Q. Did not handcuff you or take you into custody?
**A. No.**
Q. Did they search you?
**A. Yes.**
Q. How did they search you?
**A. They searched me, pulling on me and searched my truck.**
Q. Was -- you've been searched by the police before?

68

**A. Yes.**
Q. Was the search unusual in terms of how they pat somebody down at the time of a custodial search?
**A. They was patting me down, all up and down and pulling on my bag. I told them don't pull on that bag so hard.**
Q. Okay. Because as they were patting, they came on something and you told them what it was?
**A. Yes.**
Q. And what did they do?
**A. They said, "It ain't going to bust." I say, "Yes, it busts sometimes if you pull on it," and he kept on pulling on it.**
Q. All right. And did it bust?
**A. No.**
Q. And did anything else happen on that particular occasion?
**A. They searched the car, asked me questions basically. They was asking me questions. When they finished asking me all the questions, then he told me, "You can go."**
Q. Now, you testified earlier that your brother was arrested at the same time. Do you know what he was arrested for?
**A. No.**

Q. Do you know if he was subsequently convicted of any criminal offense?
**A. That day?**
Q. Yes. Well, arising out of the arrest on that particular day.
**A. I think on bond, something like that. I'm not for sure.**
Q. Do you know after March of 2013, has your brother continued to sell drugs?
**A. Not that I know of.**
Q. After March of 2013, have you had any involvement with him in the sale of drugs?
**A. No.**
Q. Have you taken any drugs other than what's been prescribed for your treatment?
**A. No.**
Q. Have you had any other contact with any member of the Houston Police Department where you allege that they used excessive force?
**A. No. Just that one time.**
Q. In your prior arrests by the Houston Police Department, did they use excessive force?
**A. What you mean? I don't understand.**
Q. All right. The fact of physically arresting someone means you have to use some force. You have to



take them into custody, handcuff them, place them in the car. My question is, during any of the prior occasions where you had contact with or were arrested by the Houston Police Department, do you believe that they used excessive force?
**A. Handcuff me?**
Q. Whatever they did. Do you think that they used excessive force for what was necessary in order to take you into custody?
**A. I don't understand what you're saying.**
Q. Have you ever witnessed an incident where you believe the Houston police officers used excessive force?
**A. Have I witness it?**
Q. Yes.
**A. No.**
Q. When you saw your brother arrested, did they use excessive force?
**A. No.**
**MR. CARNABY: I have no further questions.**
**EXAMINATION**
BY MS. GADSON:
Q. Okay. Mr. Bernard, I just have a couple of questions that I'm going to ask you. Earlier you were



speaking about some of the issues you have physically as a result of you being shot in March of 2013. And just to be clear, what part of your body gives you the most issues?
**A. My stomach.**
Q. Okay. And what are the issues you have with your stomach?
**A. Sharp pain and aches at nighttime.**
Q. The doctor hasn't been able to do anything to help you with that?
**A. No. They gave me -- made me take some pills.**
Q. Okay. And the pills don't work?
**A. No.**
Q. Okay. You talked about issues you have with driving. What issues -- what issues do you have with driving specifically?
**A. Basically, like turning the steering wheel.**
Q. And what are you using when you're turning the steering wheel?
**A. Using?**
Q. Yeah.
**A. I try to use both my hands, but sometimes it will slide.**
Q. Okay. And so the way that your hands are now prevent you from properly gripping the steering wheel?



**A. Gripping it, holding a glass in my hand without dropping it.**
Q. So compared to before you were shot and now, can you still use your hands the way that you used to before you were shot?
**A. No. I can't even play baseball with my son. He loves to play baseball now.**
Q. It's been three years since this incident. Do you think there will be any point where you will be able to have the full use of your hands that you had before you were shot?
**A. No.**
Q. Okay. If you don't mind, can you look at Exhibit No. 2? In Exhibit No. 2, you stated that it was in this area that you were -- in this area you were standing when the officers came in the door, correct?
**A. Yes.**
Q. What were you doing before the officers came into your home?
**A. I was sitting on the couch and walking towards the kitchen.**
Q. What were you going to the kitchen for?
**A. To get a glass of water.**
Q. So just to be clear, prior to the officers coming into your home, you had decided you were thirsty

73

and were going to the kitchen?
**A. Yeah.**
Q. Okay. Can you point specifically where you were standing? This isn't a very small room, so I just want to be as clear and accurate as possible to where your location was in relation to this picture that we have.
**A. I was, like, by the table. Like, in between the table.**
Q. In between the table and what else?
**A. And the China cabinet over there.**
Q. Okay. So in the picture, you're stating that you were right in the middle of the dining room table and the breakfront, correct?
**A. Yeah.**
Q. Okay. So pretty much that looks like to be the center of the dining room?
**A. Uh-huh.**
Q. And so you had not reached the kitchen door?
**A. No.**
Q. But when you were shot, you flew through the kitchen door --
**A. Yeah.**
Q. -- doorway?
**A. Yes.**

74

Q. Okay. Now, you don't recall too much about what happened after you shot. Just a small amount of time, correct?
**A. Yes.**
Q. During the time that you were on the floor and were speaking to officers, did any of them question you about a gun in your area?
**A. No.**
Q. The officer who handled you roughly and was trying to handcuff you, he didn't mention a gun?
**A. No, because there wasn't no gun by me, so he didn't say nothing about no gun.**
Q. And you were -- again, you said you were sitting in your parents -- you were sitting in your home watching a movie with your parents, correct?
**A. Yes.**
Q. Do you have any issues of paranoia? At that time, did you have any issues of paranoia?
**A. No.**
Q. So it would have been -- I withdraw that question.
At the time that you were sitting in the living room watching television with your parents, would you have had a gun on you?
**A. No.**

75

Q. And when you answered that, you made it seem like that was a ridiculous question.
**A. It is.**
Q. Why is it a ridiculous question?
**A. That's disrespecting my parents.**
Q. Now, as you were laying on the ground and you talked to the officers in that small amount of time, did you -- do you recall asking for help?
**A. Yes.**
Q. And what was their response to your request for help?
**A. He said, "Roll over. You ain't fixing to die. You going to be all right."**
Q. So there was no reassurance that help was on the way?
**A. No.**
Q. Now, during the time that you were in the hospital, there were a lot of things that happened that you just didn't know about because you were in the state you were in, correct?
**A. Yes.**
Q. According to your knowledge, did you ever see any police officers outside of your hospital door?
**A. Yes. They came in one time, because they was trying to come up to ask me questions, but my momma told**

76

**me not to talk to them. Homicide or something came up there.**
Q. Okay. Now, were you in the hospital when you found out that you had been charged with possession of a controlled substance with intent to distribute?
**A. Yes.**
Q. Now, at the time that you were at your parents' home, did you have any drugs on your person?
**A. No.**
Q. Now, the day that you were pulled over by the police officers, I want to ask you a few questions about that. During the time that they were questioning you, did you feel like you were free to walk away?
**A. No.**
Q. Where did they -- where were you located as they questioned you?
**A. Back of the car.**
Q. When you say the car, what car?
**A. Police car.**
Q. So just so I'm clear, they pulled you over, correct?
**A. Yes.**
Q. They pulled you out of your vehicle, correct?
**A. Yes.**
Q. And they placed you in the backseat of their

77

police car, correct?
A. **Yeah. After they searched me, then they placed me in the backseat.**
Q. So first they searched you?
A. **Uh-huh.**
Q. And then they placed you in the backseat of their vehicle?
A. **Uh-huh.**
Q. And then they questioned you about what happened the day you were shot?
A. **Yes.**
Q. And during this time, did you feel like you could leave?
A. **No.**
**(Malissa Wilson joined the proceedings.)**
Q. (By Ms. Gadson) Now, about how far driving is South Main from your residence?
A. **I don't know exactly, but it's -- it's a longways from there.**
Q. About how long would it take you to drive to get there?
A. **About 10, 15 minutes probably.**
Q. Now, I just want to also get some clarity on some things regarding the -- either the gun -- the brother that owned the gun that was in the washroom.

78

Which -- do you have more than one brother?
A. **Yes.**
Q. And who did this -- the weapon in the washroom, who did that belong to?
A. **My older brother, Darrell Odem.**
Q. Okay. Then you also talked about a brother owning the BB gun.
A. **Uh-huh.**
Q. Who owned the BB gun?
A. **Darrell Odem.**
Q. And had you ever seen Mr. Odem handle the BB gun?
A. **Yes.**
Q. And what was he doing with it when he handled it?
A. **He just shooting cans and stuff.**
Q. Have you ever seen him shoot the gun -- the weapon that was in the washroom?
A. **No.**
Q. Now, a lot of things that happened during -- after you were shot, a lot of things that happened you were not aware of because of the state you were in, correct?
A. **Uh-huh.**
Q. And so a lot of information you received came

79

from other people, correct?
A. **Yes.**
Q. Now, in regard to the treatment and the cause of your condition, that information came from who?
A. **Doctors and my mother.**
Q. Okay. And those are individuals that you trust?
A. **Yes.**
Q. Now, the events that took place after you lost consciousness after you were shot, there were people who shared facts with you during that time period, correct?
A. **Yes.**
Q. And who are those people?
A. **My brother, my mother and them.**
Q. Okay. And those are people that you trust?
A. **Yes.**
Q. In Exhibit No. 5, you discussed the placement of the gun and the canisters of pellets, correct?
A. **Yes.**
Q. Is this where it normally was?
A. **No, it wasn't.**
Q. Had you been in the kitchen earlier that day?
A. **No.**
Q. You hadn't been in the kitchen earlier that day?

80

A. **Huh-uh.**
Q. Okay. So the last time you were in the kitchen, was this where this gun and this pellet --
A. **No. They put it on the side of the TV in the back. My brother always put it there.**
Q. And so do you believe that this was placed here in this manner for this picture?
A. **Yes.**
Q. In Exhibit 4, do you recognize the decoration in this picture?
A. **The cover.**
Q. And where was this cover -- where would this cover normally be?
A. **In one of the bedrooms.**
Q. Okay. But this is not a gun that you recognize?
A. **No. Or the orange thing on top of it I don't.**
Q. Okay. And when you when you stayed at your parents' home, where did you normally sleep?
A. **In the front room.**
Q. Okay.
A. **On the couch.**
Q. Okay. And who slept in the bedroom?
A. **My mother and my niece.**
Q. Okay. And were you ever told who the search

81

warrant for the house was for?
A. **Yes. In court, yes, I found out who the search warrant was for.**
Q. Okay. And was the search warrant for you?
A. **No.**
MS. GADSON: I'll reserve my right to further questioning. I don't have any other questions at this point.
FURTHER EXAMINATION
BY MR. CARNABY:
Q. Just a couple questions. I know you've been at this for a long time.
How many bedrooms are in your parents' home?
A. **Two.**
Q. And when you testified a second ago to Exhibit No. 4 -- and I understand that you've testified you don't recognize the handgun, but the cover that's behind it you say you recognize from a bedroom?
A. **Uh-huh.**
Q. Which bedroom was that from?
A. **Either one, because they don't have no certain -- it could be in the front or it could be in the back -- or the one next to it.**
Q. Okay. So you don't know which bedroom that cover was in?

82

A. **Yes.**
Q. Okay. Who occupied the second bedroom? You said one was your mother and your niece.
A. **Yeah. My niece was in one and my daddy, my mother in the other one. Sometimes I go in there and sleep with her, sometimes I go on the couch.**
Q. Okay. I'm just a little confused. Your mother and father sleep in one bedroom?
A. **Yes.**
Q. Your niece sleeps in the other one?
A. **Yes.**
Q. Sometimes you sleep on the couch?
A. **Yeah, and sometimes I go in there with my niece.**
Q. Okay. You testified a second ago in response to your attorney's question about who had provided you with information about what had happened, and you said that you got information from your mother and your brother.
A. **Uh-huh.**
Q. Which brother?
A. **Darrell Odem.**
Q. Darrell Odem?
A. **Yeah.**
Q. Okay. Have you gotten any information at all

83

from Dominic Bernard?
A. **Huh-uh.**
**MR. CARNABY: No further questions.**
**FURTHER EXAMINATION**
BY MS. GADSON:
Q. Just one more question. Do you know whether or not your brother Dominic was at all arrested in connection to this search warrant?
A. **No.**
Q. So it's correct that you were the only one that was arrested in connection to this search warrant?
A. **Yes.**
Q. And it's correct that you weren't the only one in this home at this time that the search warrant was executed?
A. **I wasn't the only one.**
MS. GADSON: No further questions.
MR. CARNABY: Nothing further. Thank you.
THE COURT REPORTER: Do you want him to read and sign or waive signature?
MS. GADSON: Read and sign.
(Proceedings concluded at 1:22 p.m.)

84

CHANGES AND SIGNATURE

| PAGE | LINE | CHANGE | REASON |
| --- | --- | --- | --- |
| | | | |

I, GEORGE BERNARD, JR., have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

________________________

GEORGE BERNARD, JR.

THE STATE OF __________)
COUNTY OF ____________)

Before me, ____________________, on this day personally appeared GEORGE BERNARD, JR., known to me (or proved to me on the oath of __________________ or through __________________________ description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this _______ day of _____________________, ______.

__________________________

NOTARY PUBLIC IN AND FOR
THE STATE OF _______________

My Commission Expires: _______________



STATE OF TEXAS
COUNTY OF HARRIS

REPORTER'S CERTIFICATE
ORAL DEPOSITION OF GEORGE BERNARD, JR.
JULY 6, 2016

I, Julie M. Silhan, Certified Shorthand Reporter in and for the State of Texas, hereby certify that this deposition transcript is a true record of the testimony given by the witness named herein, after said witness was duly sworn/affirmed by me.

I further certify that I am neither attorney or counsel for, related to, nor employed by any parties to the action in which this testimony is taken and, further, that I am not a relative or employee of any counsel employed by the parties hereto or financially interested in the action.

Certified to by me on this 14th day of July, 2016.

Julie M. Silhan, Texas CSR 6507
Expiration: 12/31/2017
HIPAA Certified
Expiration: 01/07/2017
Carol Davis Reporting, Inc.
Firm Registration No. 47
7838 Hillmont
Houston, Texas 77040
713/647-5100, Fax 713/647-5157



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

GEORGE BERNARD, )
Plaintiff )
)
vs. ) CASE NO. 4:15-CV-00734
)
CITY OF HOUSTON, ET AL )
Defendant )

AFFIDAVIT

I, Julie M. Silhan, Certified Shorthand Reporter in and for the State of Texas, hereby certify that I was the officer before whom the oral deposition of GEORGE BERNARD, JR. was taken on July 6, 2016.

I do hereby certify that on _____________________,

_______ The original signature page of the deposition was submitted to ____________________.

_______ The original deposition was submitted to _________________________ for examination and signature.

_______ Notification was given to _____________________________ that the original deposition given in the above cause was complete and ready for examination and signature at the offices of Carol Davis Reporting, Records & Video, Inc., within thirty days of said date.

_______ More than thirty days have elapsed since the above submission. The original deposition, unsigned, together with all exhibits is being forwarded to __________ on ___________.

_______ More than thirty days have elapsed since the submission of the original deposition and it has not been returned to the offices of Carol Davis Reporting, Records & Video, Inc.

_______ The original deposition has been signed or the



original signature page was signed and notarized. The attached page(s) contains changes, if any, made by the witness and the reasons therefor. The original deposition together with all exhibits is being forwarded to _______________ on ____________.

_______ That a copy of this Affidavit was served on all parties shown herein, pursuant to information made a part of the record at the time said testimony was taken.

FOR PLAINTIFF:
Ms. Chareka M. Gadson
LAW OFFICE OF CHAREKA GADSON
601 Sawyer
Houston, Texas 77007
Telephone: 713/229-9997
Fax: 281/501-6777
E-mail: attorneygadson@gadsonlegal.com

FOR DEFENDANT:
Mr. Henry N. Carnaby
Ms. Malissa Wilson
CITY OF HOUSTON, LEGAL DEPARTMENT
900 Bagby, 3rd Floor
Houston, Texas 77002
Telephone: 832/393-6309
Fax: 832/393-6259
E-mail: henry.carnaby@houstontx.gov

Certified to by me on this __________ day of ___________________, 2015.

______________________

Julie M. Silhan, Texas CSR 6507
Expiration: 12/31/2017
HIPAA Certified
Expiration: 01/07/2017
Carol Davis Reporting, Inc.
Firm Registration No. 47
7838 Hillmont
Houston, Texas 77040
713/647-5100, Fax 713/647-5157