**EXHIBIT H**

**DEPOSITION TRANSCRIPT OF ELIZABETH GONSOULIN**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

GEORGE BERNARD :
Plaintiff, :
:
VS. : No. 4-15-cv-00734
:
CITY OF HOUSTON, ET. AL, :
Defendant. :

*********************************************

ORAL DEPOSITION OF
ELIZABETH GONSOULIN
MAY 17, 2016

*********************************************

ORAL DEPOSITION of ELIZABETH GONSOULIN, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on May 17, 2016, from 1:14 p.m. to 3:02 p.m., before Cherlyn K. Mann, CSR in and for the State of Texas, reported by stenographic method, at the offices of Gadson Law Group, PLLC, 405 Main Street, Suite 455, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



INDEX


Appearances............................ 3
Stipulations........................... 4
ELIZABETH GONSOULIN
Examination by Mr. Carnaby......... 4
Examination by Ms. Gadson.......... 47
Further Examination by Mr. Carnaby. 65
Signature and Changes................. 71
Reporter's Certificate................ 73


EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Page from typed offense report, COH 000206 | 23 |
| 2 | Laser color photograph | 25 |
| 3 | Laser color photograph | 26 |
| 4 | Laser color photograph | 27 |
| 5 | Handwritten statement | 32 |



APPEARANCES

FOR THE PLAINTIFF:


Ms. Chareka M. Gadson
GADSON LAW GROUP, PLLC
405 Main Street, Suite 455
Houston, Texas 77002
Phone: (713) 489-1851
Fax: (281) 501-6777


FOR THE DEFENDANT:


Mr. Henry N. Carnaby
SENIOR ASSISTANT CITY ATTORNEY
900 Bagby, 4th Floor
City Hall Annex
Houston, Texas 77002
Phone: (832) 393-6491
Fax: (832) 393-6259
E-mail: henry.carnaby@houstontx.gov




THE REPORTER: Pursuant to the Rules?
MR. CARNABY: Yes.
THE REPORTER: Would you like signature?
MS. GADSON: Yes.
ELIZABETH GONSOULIN,
having been first duly sworn, testified as follows:
EXAMINATION
BY MR. CARNABY:
Q. Ms. Gonsoulin, have you ever been deposed before?
**A. Have I ever been?**
Q. Deposed.
**A. No.**
Q. When did you first find out that you were going to be deposed today?
**A. Uh, a week ago or a couple of days ago or something like that.**
Q. Between that time and today, what, if anything, have you done to prepare for your testimony?
**A. I haven't.**
Q. Have you reviewed any documents?
**A. Have I did any kind of documents?**
Q. Have you reviewed any documents?
**A. No.**
Q. Have you spoken to anyone other than counsel

in this matter?
**A. No.**
Q. I'm going to ask you a series of questions about the incident back on May 17th -- excuse me -- back on March 19th, 2013.
It's important, because we're taking a record, that you understand my question and answer affirmatively with a statement. The court reporter can't take down a nod or another sound acknowledging something, and we want to be very clear.
If at any time I ask a question that you don't understand, please ask me to correct it or to modify it, so you do understand it because we're all just interested in your statements with regard to what happened.
**A. Uh-huh.**
Q. It's my understanding that you reside at the residence at 6725 Sherwood Drive?
**A. Yes.**
Q. How long have you lived at that address?
**A. Thirty-five years.**
Q. And in the spring, around March of 2013, who was living with you in the residence at that time?
**A. Myself, my husband, my granddaughter, and my sons.**



Q. And who are your sons?
**A. One of my son George Bernard, Darrell Odom.**
Q. And the other son is Darrell Odom?
**A. Uh-huh.**
Q. And does Dominick Bernard live with you at that particular time?
**A. At that particular time, he was married.**
Q. And where was Dominick living?
**A. Oh, I don't even know that address. He stayed on the other side of town. I think that's -- I don't even recall.**
Q. Were there occasions prior to May -- excuse me. I keep looking at the date I wrote at the top of this -- prior to March 19th of 2013 where Dominick would visit your residence?
**A. Yeah, he visits.**
Q. Do you know when the last time, before March 19th, that Dominick would have been at your home?
**A. They check on me and my husband practically every day.**
Q. Would Dominick ever be there when you were not home?
**A. No, not to my knowledge.**
Q. Were there ever any occasions where Dominick had people over that he met with at your house?



**A. No.**
Q. Were you aware of any drug sales that Dominick was conducting at your home?
**A. He was not.**
Q. You're sure that he was not conducting any?
**A. Not in my home.**
Q. Do you know if Dominick Bernard has a criminal record?
**A. Yes, he does.**
Q. Do you know what, if anything, he has been convicted for?
**A. All I know, it was drugs.**
Q. And do you know when the last conviction was in relation to March 19th of 2013?
**A. For whom?**
Q. For Dominick.
**A. Uh, I don't recall.**
Q. Do you know what type of drugs he was charged with?
**A. No, I sure don't.**
Q. Do you know if they were misdemeanor or felony charges?
**A. I really don't understand it.**
Q. All right. Do you know if he ever served time in a state prison?



**A. Yes, he has.**
Q. When is the last time that he was in a state prison?
**A. I don't even recall.**
Q. Do you recall if it was before or after March of 2013?
**A. He was home 2013, I think. I'm not sure.**
Q. Okay. And your son George Bernard, do you know if he has a criminal record?
**A. Yes.**
Q. And do you know what, if anything, he has been charged or convicted of?
**A. Uh, possession of something, intent to sell or something like that.**
Q. And do you recall when the last time he was convicted of an offense like possession with intent to sell?
**A. No, because George was not living with me when he went to jail.**
Q. Was that before or after March of 2013?
**A. I don't remember the dates.**
Q. Do you know if George has any convictions for weapons offenses?
**A. Not to my knowledge.**
Q. Do you know if he's ever been arrested for a

weapons offense?
**A. Not to my knowledge.**
Q. Do you know if Dominick has any convictions for weapons offenses?
**A. Not to my knowledge.**
Q. Your testimony is Dominick Bernard was not living with you on March 19th of 2013 at the Sherwood address?
**A. No, he was not.**
Q. Was George Bernard living with you at that time?
**A. Yes.**
Q. And how long had he been continuously living with you?
**A. It was off and on. He's with his girlfriend and me.**
Q. And did George have a room at your home?
**A. Not really. He slept on the couch.**
Q. Do you recall who was home at approximately 8:00 o'clock on March 19th of 2013?
**A. Yes. Myself, my husband, George, and my granddaughter.**
Q. And what, if anything, were you doing at that time?
**A. Looking at TV and -- well, we were looking at**



**TV, and I was doing a program for church.**
Q. When the police arrived, where was everyone located?
**A. I was sitting in the living room. My husband was sitting in the living room. George was sitting on the couch. He had got up to go toward the kitchen. And my granddaughter was in her bedroom.**
Q. Now, when you say that you and your husband were sitting in the living room, were you sitting in two separate chairs in the living room?
**A. Yes.**
Q. And there's a couch that's opposite those two chairs?
**A. Uh-huh.**
Q. And George had been sitting on that couch?
**A. Uh-huh.**
Q. But at the time the police arrived, he had already gotten up?
**A. Yes.**
Q. And where had he walked to at the time the police came in?
**A. He hadn't got very far. He was in between the living room and the dining room.**
Q. Okay. And that area between the living room and the dining room is all open. You can see someone



in the dining room from the living room?
**A. Uh-huh. It's not separated. It's all somewhat together.**
Q. What, if anything, did the police do when they arrived?
**A. They kicked the door in and come on in.**
Q. Do you recall how many policemen there were?
**A. I didn't count.**
Q. Do you recall what, if anything, they said to you?
**A. Not anything when they come in. They just came on in.**
Q. Did they ever make any statement to you?
**A. No. Only one statement was made.**
Q. What was the statement that was made?
**A. I had got up, and he told me to sit down and shut up.**
Q. Did you hear the officers have any verbal exchange with Bernard?
**A. No. I was too busy looking at the gun in my face when he told me to shut up and sit down.**
Q. Did you hear any of the officers have any verbal discussion with anyone else in the home?
**A. No.**
Q. What did Bernard do after the police entered



the home?
**A. Like I say, I was -- my eyes was on them. He was still in the area, in the living room, between the living room and the dining room. And all I was looking at, a gun in my face.**
Q. How much time passed before you heard a gunshot?
**A. It was almost instantly.**
Q. How many gunshots were there?
**A. I only heard one.**
Q. What, if anything, did you see at the time you heard the gunshot?
**A. I jumped up and say, They shot Dunner.**
Q. Who is Dunner?
**A. That's his nickname.**
Q. Okay. Could you spell it for the reporter?
**A. D-U-N-N-E-R.**
Q. And what happened when you stood up and said that?
**A. The officer put the gun in my face and told me to shut up and sit down.**
Q. And that was, again, the only discussion you had with the officers?
**A. Yes.**
Q. Could you see Bernard at the time he was shot?

13

**A. Would you repeat that?**
Q. Could you see Bernard at the time he was shot?
**A. When he was shot, no, because he flew through the second door.**
Q. Could you see the officer?
**A. No, because they told us to get up and get out.**
Q. Do you know how many officers had entered your home by the time there was a gunshot?
**A. I don't know how many. I know it was several, but I don't know how many because I didn't count.**
Q. Were officers still entering the home when the gunshot took place?
**A. I can't recall.**
Q. What, if anything, happened after the gunshot?
**A. I think one went into the bedroom where my granddaughter was. And when she came out, they had her in handcuffs and told us we need to go outside.**
Q. Did you see George at any time before you left the home?
**A. Only when they was bringing him out on a stretcher.**
Q. Were you escorted outside of your home?
**A. Yes.**
Q. And where did you go when you left your home?

14

**A. In the yard and on the back of my vehicle. They put one of us in the yard and one of us behind the vehicle.**
Q. Which one of you was put in the yard?
**A. I was put in the yard first until I told them I need to lean on something, and then they put my husband in the yard and put me behind the vehicle.**
Q. And where did they put your husband initially?
**A. In the yard.**
Q. All right. I'm sorry. I just misunderstood.
**A. Oh, no. Like I say, he was putting him behind the car first, but when I asked him can I lean on something, he exchanged it and put him in the yard and me behind the car.**
Q. All right. Thank you. And where did your granddaughter go?
**A. They had her -- they put her in a car because she was upset.**
Q. Can you recall whether it was a marked police car?
**A. I -- I don't recall.**
Q. How long did you remain leaning up against your vehicle?
**A. They put us -- I -- I don't know how long.**
Q. What, if anything, happened, or where did they

15

move you from behind the vehicle?
**A. In a police car.**
Q. And do you recall whether that was a marked police car?
**A. It was -- yes, it was marked.**
Q. And do you recall if the officer who moved you there was a uniformed officer, or was he one of the officers that had originally entered the home?
**A. He was a uniformed officer.**
Q. Let me take you back for a second. The officers who entered your home were not wearing an ordinary police uniform?
**A. Oh, no.**
Q. What were they wearing?
**A. All black and hoods or whatever you call it. Hoods --**
Q. Some sort of a helmet or visor?
**A. Yes.**
Q. And did their black clothing have markings as police?
**A. I didn't see it.**
Q. When you came outside your home, there were other police officers that were wearing uniforms?
**A. When I came outside, yes.**
Q. And the officer who escorted you to the marked

16

patrol car was a uniformed officer?
**A. Yes.**
Q. Do you know who that officer was?
**A. No.**
Q. Do you know who the officer was who told you to sit down?
**A. No.**
Q. What, if anything, happened to you after that?
**A. You mean after I went outside?**
Q. Yeah. After you were placed in the patrol car.
**A. Oh, stayed in there quite a long time. So I --**
Q. Could you see what was happening around and outside your home?
**A. No.**
Q. When you say a long time, do you know approximately how long you were in that patrol car?
**A. It was quite a long time, I know. I don't know how long it was.**
Q. Did you have any conversations with officers?
**A. Yes.**
Q. What, if anything, did you say to the officers?
**A. I didn't say anything to them. They were**

17

talking to me.
Q. And what, if anything, did they say to you?
**A. They kept asking me what my son name was and how to spell it.**
Q. And did they ask you that multiple times?
**A. Yes.**
Q. Did they ask you anything else?
**A. That's about all they was asking me about, what his name and how to spell it.**
Q. You don't recall any other questions that they asked?
**A. Not those. I mean, not those officers that put me there.**
Q. Did you ever make them aware that you had any medical issues?
**A. My granddaughter did.**
Q. Now, your granddaughter was in another patrol car at the time?
**A. Yes.**
Q. So you don't actually know what she said to the officers?
**A. No.**
Q. Do you know if the officers did anything as a result of what your granddaughter told them?
**A. After we got downtown, they did.**

18

Q. Did you have any other conversations with the officers at the scene, other than the individuals who were asking you your son's name and how to spell it?
**A. I had another officer come to the car and ask for permission to take pictures.**
Q. And did you give him permission?
**A. At first I didn't, but I told him, Why should I? The other officer didn't have permission to bust in my house. And he stated that he was not those officers, that he was homicide, which I didn't understand. So then I did tell him, and I signed a paper giving him permission.**
Q. And did you tell that officer that you had any medical problems?
**A. That officer, no.**
Q. Did you tell any of the officers at the scene that you needed to use a restroom?
**A. I sure did.**
Q. Who did you tell that you needed to use the restroom?
**A. I don't remember who I told, but I told one officer, and then another officer. A young lady officer came up, and I told her I needed to use the bathroom.**
Q. And what, if anything, did they do?

19

**A. She said I couldn't. Could I hold it until I got downtown? And I told her no, it was too late. And they took me out of the car.**
Q. And what happened then?
**A. They was getting ready to put me in another car, and I told them I would not get back and sit down on that mess.**
Q. Okay. You described a mess. Did something happen before you left the first patrol car?
**A. Yes.**
Q. All right. What happened?
**A. I used the bathroom all over myself.**
Q. Okay. Did you urinate or defecate or both?
**A. Both.**
Q. And did you tell any officer what had happened at the time that happened?
**A. Yes. She stated to me -- the lady officer stated to me I could clean up when I got downtown, and I refused to get back in the car and sit on that.**
Q. What happened next?
**A. I asked her -- she said I could not go in my own house. I asked her could I go to a neighbor, if they would let me come clean up.**
Q. And what was her response?
**A. The other lady officer went in the house and**

20

**got me some changing clothes, brought them to me.**
Q. And were you then allowed to go to the neighbor's house?
**A. The other officer walked me to the neighbor's house, and I asked him, Could I use it? They did not want the officer in there, but the officer went in there with me and stood at the bathroom door with me while I proceeded to clean up.**
Q. And what happened after that?
**A. When I cleaned up, I came back, and they put me in another car.**
Q. And then what happened?
**A. Went downtown. Well, before all that, when we were in the yard, I asked, Can I go with my son? They told me no, because I didn't know they had already said he was dead. I didn't know that.**
Q. Let me take you back for a second. In relation to the story you just told me about having to urinate and defecate, when was it that you asked if you could go with your son to the hospital?
**A. That was before all that happened. That's when we first came out of the house, and then when they finally came to get him, and he was on a stretcher.**
Q. Do you know, did the police call for an ambulance immediately?

**A. If they did, they wasn't there immediately.**
Q. How long did it take for an ambulance to arrive?
**A. He was in that house a good 25, 30 minutes before any ambulance came.**
Q. And when the ambulance arrived, was it a Houston Fire Department ambulance?
**A. I don't recall. I don't recall. All I know -- I think it -- it was not a fire truck, no. No.**
Q. Do you -- the Houston Fire Department has both --
**A. I know.**
Q. -- emergency medical technician units, and they have paramedic units.
Do you know if the unit was paramedics or EMTs?
**A. I didn't even look to see what it was. My concern was him.**
Q. And how long after the ambulance arrived did you see your son?
**A. After they took him out, I didn't see him anymore.**
Q. All right. I guess my question is, do you know how long it was between the time the ambulance arrived, and they brought your son out?



**A. They brought him out in about five or ten minutes, something like that.**
Q. And was it during the time when they brought him out that you were asking if you could go with him to the hospital?
**A. Yes.**
Q. And what did they tell you?
**A. No.**
Q. Why did you believe that your son was dead?
**A. I didn't know what the -- whatever you call that people -- the other cop, officer that I signed the papers for, I didn't know he was there because someone died. That's when they come out. I didn't realize that.**
Q. Okay. Maybe I didn't understand you. Did you think that your son had died that night?
**A. I didn't think anything because my mind was so -- all I could hear is the busting in and the shot.**
Q. Nobody ever told you that your son had died that night?
**A. No.**
Q. Now, when they took you downtown, did they take you to the police headquarters?
**A. To the what?**
Q. To the police headquarters.



**A. No. I -- I don't think that was the police. I don't know what you -- you mean like on Riesner Street or something like that?**
Q. Yes.
**A. I don't think it was Riesner Street.**
Q. Okay. Was it a high-rise building, or was it a precinct station somewhere in the system?
**A. I know it was downtown.**
Q. And when you arrived downtown, were you interviewed?
**A. Yes.**
Q. And do you know, was that interview recorded?
**A. I don't recall.**
**(Gonsoulin Exhibit No. 1 was marked.)**
Q. (BY MR. CARNABY) It may be a little hard to read because -- I'm going to represent to you that this is part of a report that was filed by a homicide investigator with the Houston Police Department. And this is page 17 of that particular report. And we've marked it as Exhibit No. 1.
There's a section at the very beginning of the page where the first paragraph talks about you being transported.
**A. Uh-huh.**
Q. Do you see what I'm talking about?



**A. Uh-huh.**
Q. To the homicide division located at 1200 Travis, which is here downtown. And that your statement was recorded in audio and visual -- excuse me -- and video.
Does that refresh your memory as to whether or not it was a recorded statement?
**A. No. That -- no.**
Q. Now, this purports to be a summary of your statement.
**A. No. No.**
Q. It is not a transcribed copy of your statement?
**A. No.**
Q. Have you read the three paragraphs of the statement?
**A. I am reading it now, and I came to a part, that, no.**
Q. All right. Let me take you through the statement and find out what, if anything, you believe is inaccurate within the statement.
**A. Okay.**
Q. Is there anything in the first paragraph that you believe is inaccurate?
**A. No.**

Q. And it's accurate where it says that you told them that George doesn't like the police and took off running?
**A. No. No.**
Q. So that is inaccurate?
**A. That's true.**
Q. Now, the next paragraph talks about guns that are in the house, that you told them that there was a shotgun and a pellet gun that are kept in a back room.
**A. No. No.**
Q. Is that inaccurate?
**A. That's inaccurate.**
Q. So there is no shotgun in your home?
**A. There was a rifle in my washroom.**
Q. All right. What type of a rifle was it?
**A. It was a souvenir rifle that my son's friend gave to him after his grandfather passed.**
**MR. CARNABY: Can I mark this as Exhibit 2?**
**(Gonsoulin Exhibit No. 2 was marked.)**
Q. (BY MR. CARNABY) I'm showing you what's been marked as Exhibit 2 to your deposition. Is that the rifle that you described?
**A. Yes. And that's the washroom behind the door.**
Q. Okay. And where is the washroom located?



**A. It's when you enter the living room and there's a dining room, and to the left is a washroom.**
Q. So it would be to the left of the dining room?
**A. Uh-huh.**
Q. But not back in the kitchen?
**A. No.**
Q. And there's a statement here attributed to you that there was a pellet gun that was kept in the back room. Is that true?
**A. It was a pellet gun that was kept in the dining room -- not the dining room, the den.**
Q. And where is the den located?
**A. From the kitchen, the den and the kitchen are combined.**
**MR. CARNABY: Let's mark that as Exhibit No. 3.**
**(Gonsoulin Exhibit No. 3 was marked.)**
Q. (BY MR. CARNABY) I'm showing you what's been marked as your Deposition Exhibit No. 3. Is that a photograph of the pellet gun?
**A. Yes, but it wasn't laying where this picture is taken.**
Q. Where are you saying this picture was taken? This picture was taken in the den?
**A. In the den.**



Q. Okay. Where is that in relation to the kitchen?
**A. The den is on one side, and the kitchen part is on the other side. There's a bar in between.**
Q. Are there any other guns in your home?
**A. No.**
**MR. CARNABY: Mark this as No. 4.**
**(Gonsoulin Exhibit No. 4 was marked.)**
Q. (BY MR. CARNABY) I'm showing you what has been marked as Exhibit No. 4. This is a .380 caliber semiautomatic pistol.
Have you ever seen that gun before?
**A. No.**
Q. To your knowledge, was that gun in your home that night?
**A. That gun was not in my house.**
Q. Do you know whether Bernard had ever brought any gun into your home?
**A. No, he has not.**
Q. Do you know if Dominick has ever brought a gun into your home?
**A. The only gun that was brought into my home was the rifle.**
Q. All right. Are you aware of any marijuana that was in your home?



**A. There wasn't any in my home.**
Q. Are you aware of any liquid codeine that was in your home?
**A. It was not in my home.**
Q. Are you aware of any PCP or Phencyclidine that was in your home?
**A. It was not in my home.**
Q. How about the area surrounding your home; the sheds and outbuildings? Were you aware if there was any drugs in those areas?
**A. No, it's not.**
Q. Now, going back to your statement, which is marked as Exhibit No. 1, is there anything else that you disagree with in the second paragraph?
**A. I disagree with all of it.**
Q. All right. Now, you have said that you -- you heard a gunshot. You have said that you believe you heard one shot.
**A. I did hear a gunshot.**
Q. That's correct?
**A. Yes.**
Q. Now, it says that after that, you heard officers saying to call an ambulance. Is that not true?
**A. No, I did not hear no one say call an**

**ambulance.**
Q. Okay. Now, it says that you did not see what happened when the officer shot. Is that true?
**A. No, because when he shot him, he flew through that door, and I couldn't see anything.**
Q. Okay. So what did you see when the officer fired the shot?
**A. When the door busted, I heard it, and that's it. And that's when I hollered, They shot Dunner.**
Q. And then it says you were told to sit down, and you couldn't see what happened. Is that not true?
**A. They told me to sit down and shut up. You know what your son do.**
Q. And at that point, you could or could not see what happened?
**A. No.**
Q. You could not see what happened?
**A. No, I couldn't see.**
Q. Did you hear George say anything prior to the shooting?
**A. I did not -- I couldn't. After he had went through that door, I couldn't hear anything because I'm watching the gun in my face.**
Q. Okay. Again, this statement says you did not hear George say anything prior to the shooting.



**A. No. He was -- no, because when they come in, they come in, rushed in. I didn't know what was going on.**
Q. All right. The third paragraph of this statement, did you tell the officer that George had spent the year in jail for a possession case?
**A. No.**
Q. Did you tell the officer that you knew George did not want to go back to jail?
**A. Downtown. I told the officer that questioned me downtown, I told him he would not do anything to put his self back in jail.**
Q. All right. The next sentence says, George stays at the house, but he doesn't have a room. He usually sleeps on the couch.
Is that true?
**A. That's true.**
Q. Is that something you told the officer that night?
**A. No, because he mostly spend with his girlfriend.**
Q. The next sentence says that he's been staying with us for a few months. That's not true?
**A. No, because he ain't staying with us, period. He just off and on.**



Q. So for how long had he been staying with you off and on?
**A. It's a while. It's maybe a little longer than any two or three months.**
Q. And then the last part of the statement relates to the pellet gun, that you kept the pellet gun to shoot opossums that get in the house. Is that true?
**A. That's not what I said. I said the pellet gun was brought because we was remodeling. We was remodeling in the back, and it was open, and a opossum had been getting in the house. And we had that to try to keep them out, get them out.**
Q. Is the statement, "We all use to play around with the pellet gun," is that untrue?
**A. Yes. That's untrue. I don't play with no pellet gun.**
Q. And the last sentence that, "The pellet gun is always around in the back," is that untrue?
**A. It was always in the back, but not where you got the picture at.**
Q. Is there anything you recall telling the homicide investigator during your statement which is not included in this summary?
**A. The homicide, when he came and asked for my permission to take pictures?**



Q. No. This is the male or female officer that interviewed you at Travis.
**A. No. It was not a female that interviewed me.**
Q. Okay. Well, I don't know.
**A. It was a male.**
Q. All right. Do you recall telling him anything that is not included in this summary that he provided?
**A. I never told him anything about George didn't like police officers; afraid of them, no; scared around them, no. I never said that.**
Q. Okay. Was there a later time where you were asked to provide the Houston Police Department with a sworn statement?
**A. Sometime later. They kept asking for it, but I was back and forth at the hospital, so I did not write none out when they was asking for it.**
Q. I'm sorry. Give me just a moment. It was supposed to be in the folder, but I'm not finding it there.
MR. CARNABY: If I could have this marked as Exhibit 5.
(Gonsoulin Exhibit No. 5 was marked.)
Q. (BY MR. CARNABY) Ms. Gonsoulin, I'm showing you what has been marked as your Deposition Exhibit No. 5. Do you recognize this statement?

33

A. **No, this right here --**
Q. I'm sorry. Are you on the second page?
A. **Yes.**
Q. The first full page of the narrative?
Let me ask you, first of all, do you recognize this statement?
A. **Yes, but let me correct that the way -- the way I wrote it, it might look like that, but that's not the way it went down.**
Q. Okay. Well, just to take you back, at the very end -- this appears to be a printed statement, and on the -- I believe it's the fourth page, it ends with your signature.
Is that your signature on this statement?
A. **Yes.**
Q. And do you recall in the last page having sworn to this statement in front of a notary on June 18th of 2013?
A. **I don't remember that. I remember writing it and handing it to the person that came to my house.**
Q. Is this statement all -- it's printed, but is this your printing that's on this statement?
A. **When I said kick the door down, it was the front door, and when he shot Dunner -- I mean George. I'm sorry.**

34

Q. I'm sorry. I don't want to cut you off, but I think the question that was pending was, do you recognize this as a statement that you printed out, that everything here is your printing?
A. **I printed this. Yes.**
Q. And are those your initials that appear in the bottom left-hand corner of each page?
A. **Yes. He asked me to initial it.**
Q. But you do not recall having sworn to this statement in front of a notary?
A. **No. No, I did not.**
Q. Okay. Now, what, if anything, in this statement do you believe is inaccurate?
A. **The only door that was kicked in was the front door. The door to the kitchen is what George flew through when he shot him.**
Q. So that was a mistake when you wrote --
A. **I got my words mixed up.**
Q. -- the officer behind George kicked the door down and said --
A. **No. It was the front door they come through. The only door that got kicked in was the front door. And when he got shot, he went through the middle door going to the kitchen because he was not in the kitchen. He was in the dining room area. Well, really, living**

35

**room, dining room right together.**
Q. All right. In the middle of the first page, there is a statement that you asked what's going on to one of the officers. Is that true?
A. **Now, I didn't know whether it was the police. I didn't know about the black and all this here. Yeah. I remember him asking -- telling me that, You know what your son do.**
Q. Did you stand up and begin talking to the officers before the shot was fired?
A. **I jumped up when the shot -- when he was shot, and that's when he told me to sit down and shut up. You know what your son do.**
Q. All right. Is there anything else that is inaccurate in this statement that you provided?
A. **I think that one was -- I hadn't -- I didn't -- no. George did not have a gun. I was saying the officer had the gun. I say, He got a gun.**
Q. Maybe I misunderstand what was being said here. From my reading, it says that your husband told you to sit down because he pulled the gun on you?
A. **No. No. He told me to sit down and shut up with the gun in my face, and my husband was saying, Listen to him; listen to him.**
Q. Okay. Is there anything else in this

36

statement that's not an accurate statement of what happened the night of this incident?
A. **The way I wrote this here, it seem like I'm saying it, but no. It was the officer I was saying got a gun. And that's when I hollered out and said, telling my granddaughter, They shot Dunner, and he didn't even have a gun.**
Q. All right. Anything else about the statement that's inaccurate?
A. **As far as I can see that -- I hate to relive all this over again.**
Q. Everything else in this statement comports with your recollection of that particular night?
A. **Yeah. That's the only misunderstanding on that part, what I was telling you then.**
Q. There's a section at the end where it talks about bringing you your keys, your wallet, and your medication.
Did the police bring all that property to you at police headquarters?
A. **It was brought to me, yeah. I don't know who brought it, but it was brought to me.**
Q. And had you requested those items?
A. **No. My granddaughter did.**
Q. And was there some concern for your well-being

while you were at police headquarters?
**A. I have a lot of medical problems.**
Q. Did they ask paramedics to come to headquarters to check you?
**A. Yes.**
Q. And did those paramedics recommend that you go to a hospital that morning?
**A. Yes.**
Q. And did you decide to go to the hospital?
**A. No. I was concerned about my son.**
Q. So you --
**A. Nobody was telling me anything.**
Q. Do you recall that you signed a statement declining to be transported to the hospital?
**A. Yeah. Uh-huh.**
Q. Now, did you have a large amount of money in your wallet or your purse?
**A. Yes, I did.**
Q. How much money did you have in your purse?
**A. I had just received income tax, plus I -- my suite attendant doing rodeo at the stadium, and I had made quite a bit of money, and I had all that in my purse.**
Q. If I told you that the officers inventoried $1,801 in your purse, would that be correct?



**A. No. It was more than that in there, in my purse.**
Q. How much do you contend was in your purse?
**A. I can't recall. It was more than that because my income tax was more than that, and I had just cashed it. And all my stubs for all of that was in the purse also.**
Q. And did you ever make any claim to the police department that money had been taken?
**A. No, because my money was there.**
Q. But you said there was more money than that?
**A. Yes.**
Q. My question is, did you make any claim to the police department that some of your money was missing?
**A. It wasn't any missing.**
Q. All right. I'm sorry. I just don't understand. Was all of your money in the purse?
**A. All my money was in the purse.**
Q. When it was brought to you?
**A. Yes.**
Q. Okay. I misunderstood you to say that your money was not there.
**A. No. No. All the money was there.**
Q. And what's the reason, again, why you would have so much money -- it was all in cash. Is that



correct?
**A. Yes.**
Q. And in the inventory, would I be correct if it said that you had 11 $100 bills and 31 $20 bills? That's a lot of money in cash.
**A. I had just cashed my check.**
Q. So you had cashed your income tax refund and asked for all of it in cash?
**A. Uh-huh, plus my job.**
Q. What was your job again?
**A. I'm a suite attendant. I had worked the rodeo.**
Q. Now, if I understand it correctly, the suite attendants are the people that provide services to the suite owners during the event?
**A. There you go.**
Q. So would that have been tips, or would that have been payment for what happened in the suite?
**A. Tips and payment.**
Q. Okay. How much money would you normally receive as a suite attendant at the rodeo?
**A. The fee or the tip?**
Q. Why don't you give me the fee first?
**A. Well, it depends on how many days you work.**
Q. Okay. On this particular occasion, do you



recall how many days you worked?
**A. Round about $1,500 for fee.**
Q. And how much do you recall were tips?
**A. Twenty-five.**
Q. And would that normally be paid to you in cash?
**A. Uh-huh. I -- no. I had cashed the check. Like I said, the receipts was in the purse also.**
Q. So you had cashed the check --
**A. I had cashed two checks.**
Q. I'm sorry. I don't mean to talk over you.
**A. Uh-huh.**
Q. You had cashed the check that you received for the fee and tips as a suite attendant?
**A. Uh-huh.**
Q. And the second check you received as an income tax refund?
**A. Uh-huh.**
Q. And the sum of those two was the $1,801 that you had in your purse?
**A. They say that's what I had in my purse, but it wasn't. I received all my money that I had in the purse. I don't know where they got the 1,800 from.**
Q. Okay. But you're not contending that the police had taken any money?

41

**A. Oh, no. No. No.**
Q. Okay. You understand that you have been added as a plaintiff in this lawsuit against the City and a number of officers?
**A. Yes.**
Q. I want to go through the counts and just be sure I understand what claims you're making.
**A. Uh-huh.**
Q. Count one is false arrest. You're not alleging that you were falsely arrested, are you?
**A. No. The only thing I was concerned about is why I couldn't go with my son.**
Q. Okay. Count two is excessive force. Are you alleging that anyone used excessive force against you?
**A. I used the bathroom on myself.**
Q. Okay. Is it your understanding that you believe that that constitutes excessive force by the police?
**A. They wouldn't let me go in my own house.**
Q. All right. So you believe that that was excessive?
**A. Uh-huh.**
Q. Count 3 is false imprisonment. Do you contend that you were falsely imprisoned?
**A. Uh-huh.**

42

Q. And for how long were you detained that night?
**A. I got back home about 4:00 o'clock that morning, 4:00 or 5:00 o'clock that morning.**
Q. Were you ever handcuffed?
**A. Yes.**
Q. Were you ever told that you were under arrest for any reason?
**A. No.**
Q. Were you ever charged with any criminal conduct arising out of that evening?
**A. No.**
Q. Do you understand what a Brady violation is?
**A. A who?**
Q. A Brady, B-R-A-D-Y, violation. Count four alleges a violation of the Federal Civil Rights Statute 42 USC 1983, a due process Brady violation.
You don't allege any Brady violation against you?
**A. They come in my house and do what they did.**
Q. Okay. A Brady violation has to do with providing evidence during a criminal prosecution to the defense. You were never prosecuted?
**A. No.**
Q. All right. Do you make claims against the officers for conspiracy to commit constitutional violations?

43

**A. Uh-huh.**
Q. And which officers do you believe conspired?
**A. The one that put the gun in my face.**
Q. And who was he conspiring with when he put the gun in your face?
**A. Explain.**
Q. Conspiracy is an action of two or more people to achieve an illegal object. It's not something you can do by yourself.
**A. Uh-huh.**
Q. So who did that officer conspire with?
**A. I don't understand.**
Q. All right. And from your statement, that officer was African American?
**A. Yes.**
Q. And you don't know the identity of that officer?
**A. No.**
Q. You allege a failure of the officers to intervene from using excessive force against your son.
Did the officers have an opportunity to intervene?
**A. I don't understand what you're saying.**
Q. Did the officers have an opportunity to stop the first officer from shooting your son?

44

**A. I still not understanding what you're saying.**
Q. Okay. How could one of the officers at the scene have intervened to prevent your son from being shot?
**A. I still don't understand.**
Q. Okay. Now, you don't allege any claim of malicious prosecution. Is that correct?
**A. I'm not understanding what you're saying.**
Q. You were never prosecuted --
**A. No.**
Q. -- for any criminal offense?
**A. No.**
Q. So you're not making a claim against the City or the police officers for malicious prosecution?
**A. No.**
Q. Are you making a claim for assault and battery?
**A. I don't understand what you mean. I know what assault and battery -- well, what -- what are you saying?**
Q. I'm just asking if you are making a claim against the City or any of the officers for assault and battery.
**A. I'm not understanding it.**

Q. You say you understand what assault and battery was. Do you believe that you were battered that particular night?
**A. Putting the gun in my face, I feel like that. Invading my privacy.**
Q. All right. But invasion of privacy is a little bit different than assault.
**A. Busting my door in, coming in, tearing up my house like that.**
Q. All right. You allege claims of intentional infliction of emotional distress?
**A. Uh-huh.**
Q. And who intentionally inflicted emotional distress on you?
**A. The officers coming in my house like that.**
Q. Anything, other than the manner in which they entered your house, you believe inflicted emotional distress?
**A. I'm not understanding that either.**
Q. Well, I'm trying to understand your claim.
**A. Yeah.**
Q. And if you're saying that they intentionally took actions to try to inflict emotional distress on you, I'm trying to understand what action you allege that they intentionally took in order to put emotional



distress on you. And you've told me that entering the house the way they did.
**A. Uh-huh.**
Q. Was there anything else that they did?
**A. Would not let me see my son. When I did get a chance to get home, I had to go through my pastor in order to get in to see my son.**
Q. This was when your son was in the hospital?
**A. Uh-huh.**
Q. And the police at the hospital would not allow you to see your son?
**A. No.**
Q. Is there anything I haven't asked you that you'd like to say while you have the opportunity during your deposition?
**A. I can't think of anything at the moment.**
Q. All right. I appreciate your time. I understand it may be difficult.
You will have an opportunity to review your testimony, and if you believe that the court reporter has taken something down inaccurately, your counsel will advise you on what you can do to try to correct the record.
**A. Uh-huh. Okay.**
Q. Thank you for your time.



**A. Thank you.**

**EXAMINATION**

BY MS. GADSON:
Q. Mrs. Gonsoulin, I'll just be asking you just a couple of questions. I'm not going to hold you here any longer than you need to be, but we're going to go back and start over from the beginning regarding some of the questions that you answered. Okay?
**A. Uh-huh.**
Q. You stated -- do you recall providing testimony regarding when the officers spoke to you when they came in the house?
**A. No one spoke to us when they came in the house.**
Q. Okay. And so the first time an officer said anything to you was after your son was shot?
**A. Uh-huh.**
Q. And what was it that the officer said to you?
**A. Sit down and shut up.**
Q. So the officer told you to sit down and shut up --
**A. You know what your son do.**
Q. And you were getting up to check on your son?
**A. Uh-huh.**
Q. And that was the officer's response to you?



**A. Yeah.**
Q. You stated that you dealt with two officers after you had your accident in the police car. Correct?
**A. Yes.**
Q. And the -- do you remember anything about the physical characteristics of the officer who told you that you could not use the restroom?
**A. It was a white female officer said I couldn't go in the house to use the bathroom, and I think it was a black female officer that went in the house and got some changing clothes for me.**
Q. Okay. And do you recall there being any other women officers at your house that night?
**A. I don't recall.**
Q. Okay. And just for clarity, when you had your accident in the police car, was your son still in the house?
**A. Uh, I can't recall. Was he still -- no. He wasn't still in the house because I do remember before I used the bathroom on myself, I asked, Can I go to the bathroom, and no one never responded to it. I asked twice about can I go to the bathroom.**
Q. Okay. In that picture of the rifle, I believe it's Exhibit No. 2, is this the location you recall the

rifle always being in?
**A. Yeah, behind that door.**
Q. Okay. Now, for Exhibit No. 3, you stated that you do recognize this pellet gun. Correct?
**A. Yeah. I don't know too much about guns, pellet guns and stuff, but it looks like that was the one.**
Q. Okay. And is your testimony that that gun was not -- that pellet gun was not in that location?
**A. No, it wasn't in that location.**
Q. And so it was placed there?
**A. Huh?**
Q. It was placed there?
**A. It had to be because it was never kept right there.**
Q. So after unknown people came into your home, that pellet gun was placed there?
**A. Yeah, because that pellet -- and those are the BBs that goes in it.**
Q. And are the BBs that go in it, are they usually located right there?
**A. No. It's on the -- it's on the -- way on the other side. There's a TV set in there. And it's way on the other side behind, because I have a lot of grandchildren be coming in there.**



Q. Okay. And so when you look at this picture, you know that the pellets and the pellet gun was not there like that?
**A. No.**
Q. All right. You read over and answered questions regarding the statement that a homicide detective recorded and summarized for you. Correct? I believe it is Exhibit No. 1.
**A. What?**
Q. Exhibit No. 1, could you grab that for me?
**A. (Witness complies.)**
Q. You recall looking over this. Correct?
**A. Uh-huh.**
Q. Now, I want to just get clarity on a couple of things. You stated that this officer summary of your statement is inaccurate in more than one paragraph?
**A. Yes.**
Q. Okay. So you're stating -- is your testimony that when the officer said that he summarized your statement, that's not true?
**A. No, that's not true.**
Q. Now, there's a couple of things I want to ask you a couple of questions about. In this paragraph that starts off, I don't really know, if you go down, one, two, three, four, five -- about the fifth line, at



the end where it says, George doesn't like police and took off running. Do you see that?
**A. Yes, I see that. That's not true.**
Q. So this is a statement that the officer put in this summary that you didn't say?
**A. I didn't say that.**
Q. And how are you certain that you didn't tell the officer that?
**A. Because that's not George.**
Q. Okay. Did George take off running?
**A. No.**
Q. Okay. So in the second paragraph below that one, you'll see in the second line where it says, "I did not know what was going on," do you see that in the second paragraph, the second line down? The paragraph that starts off, The only gun.
**A. Okay.**
Q. Okay? And do you see the second line in that paragraph?
**A. Uh-huh.**
Q. Okay. And do you see where it says, "I did not know what was going on, but George ran to the back"?
**A. No. That's not true.**
Q. So, again, the officer put a statement in here



that you never said?
**A. Yeah. I didn't say that.**
Q. Okay.
**A. It's nowhere he could run. If they saw the back of the house, it's nowhere he could go.**
Q. And so, also, in the same paragraph, in the fourth -- on the fourth line, it says, After the shots, I heard officers saying to call an ambulance.
**A. No.**
Q. You're saying no. Let me ask -- let me get clarity on your negative response.
Did you tell the officer that you heard that?
**A. No.**
Q. So that's something else that this officer put in this statement -- your summary of your statement that you never said. Correct?
**A. Correct.**
Q. Okay. In this next paragraph, the one that starts off, My son George, in the one, two, three -- in the fourth line down, there is a statement in here, "George is scared around police and doesn't like to be around police."
**A. No, I didn't say that.**
Q. So the officer put this down in your

53

statement, and you never told him that?
**A. No, I never did.**
Q. Okay. Now, I want to ask you a couple of questions about the handwritten statement. Now, I am clear that this is a statement that you wrote yourself.
**A. Yes.**
Q. And so I just want clarity on a few things. There's a date at the top of this statement, and did you write that?
**A. Yes.**
Q. And is that the date that you wrote this statement?
**A. Yes.**
Q. Where were you located when you wrote this statement?
**A. At the hospital.**
Q. And was there anyone else present when you wrote this statement?
**A. No. I don't think so. People were in and out because George was having surgery every other day, so I never hardly left the hospital.**
Q. Okay. And so was there an officer present when you wrote this statement?
**A. I can't recall.**
Q. Okay. Do you recall -- look on the last page,

54

page 6.
**A. (Witness complies.)**
Q. And did you recall giving this statement to Sergeant Bush?
**A. I remember a Sergeant Bush, yeah.**
Q. Okay. So did you hand this handwritten statement to him?
**A. Yes.**
Q. Okay. Now, when you handed him this handwritten statement, was there anyone else present?
**A. Uh, my oldest son and my granddaughter.**
Q. Okay. And where were you all at when you gave this to Sergeant Bush?
**A. In my living room.**
Q. So Sergeant Bush came to your house and got this statement from you. Right?
**A. Yes.**
Q. Okay. And so when you gave this statement to Sergeant Bush, was a notary present?
**A. No.**
Q. Okay. Do you know if Sergeant Bush was a notary?
**A. I didn't know he was a notary, no.**
Q. Okay. So you didn't see him notarize this in front of you?

55

**A. I don't recall it.**
Q. Okay. Now, there's some other statements that I want to make sure are clear regarding your statement. Okay, Mrs. Gonsoulin?
**A. Uh-huh.**
Q. Okay. When the officers came into your home and your son was shot, did that happen fast to you?
**A. Yeah.**
Q. Okay. So when you stated in your -- in this handwritten statement that George was up and moving toward the kitchen --
**A. Yeah.**
Q. -- I asked what was going on. One of the officers replied, You know what your son do. It was a black officer.
**A. Yeah.**
Q. Did you -- all of that happened very quickly. Correct?
**A. Uh-huh.**
Q. Okay. And when they came into the door, where did they go?
**A. They came -- just come straight on in.**
Q. And so right here, when they say they went straight behind George, you recall writing that?
**A. Yeah. He was the only one up at that time**

56

**going towards the kitchen. When the shot went off, I jumped up.**
Q. Okay. And so when the officers came in, they went towards your son?
**A. Uh-huh.**
Q. Okay. And when you say the officer was behind George, kicked the door down, are you saying -- did you believe in this statement that the officer who was behind George was the one who kicked the door down?
**A. I don't know who kicked it down. I was speaking about the front door. I don't know who -- you know, because like I say, I was looking at TV, and I was writing. And when they come in, it shocked me so; so, you know, I didn't know what was going on.**
Q. Okay. And so right here, it says, And said he got a gun and shot him. Who was the one who said that?
**A. I'm saying the officers had a gun.**
Q. Okay. And so did you say that, because right here, look again, it says, And said he got a gun and shot him. Who are you saying said that?
**A. I'm saying that he got a gun.**
Q. Okay. So you were the one --
**A. The officer had a gun.**
Q. So you were the one who made that statement?
**A. Yeah.**

Q. And the "he" that you were referring to having a gun was who?
**A. The officers.**
Q. And the "him" who was shot was who?
**A. George.**
Q. Okay. And so, again, below that, you said, I hollered out and said, They shot Dunner. He didn't have a gun.
Again, that is you making that statement?
**A. Yes.**
Q. And right here where you say, They shot Dunner, you were referring to one of the police officers. Correct?
**A. Yes.**
Q. And he didn't have a gun, you were referring to your son?
**A. Yes.**
Q. Okay. Now, about -- just to be clear about your -- the money. You recall that Mr. Carnaby stated that the officers placed in their paperwork that they inventoried about $1,800 from you. Correct?
**A. Uh-huh, but I had more. You know, they didn't take anything from me. That's what I was saying. They didn't take anything from me, but it was more than that in the purse.**



Q. So what you're saying in your testimony is that the number that they inventoried is not the correct amount that was in your wallet?
**A. Right.**
Q. And is it your testimony that there actually was more money in your wallet?
**A. Yes.**
Q. Now, you testified earlier about your experience with the police officers, and you testified about being handcuffed. Correct?
**A. Uh-huh.**
Q. Did you feel like at any point that you were handcuffed that you were free to leave?
**A. I'm not understanding.**
Q. You were handcuffed. Correct?
**A. Which time? Because when I was asked that, that night, I wasn't, but I was speaking of when they arrested Dominick some time back, they handcuffed me for no reason.**
Q. Okay.
**A. And everybody kept telling me I should have went to an attorney fast about that.**
Q. Okay. Well, from the time that you said that the officers -- you were with them at the police station until about 4:00 o'clock in the morning.



Correct?
**A. Yeah. About 4:00, 4:30, something like that.**
Q. And they came to your home about, in your statement, you said between 8:00 p.m. and 9:30.
**A. Uh-huh.**
Q. Okay. Now, after -- from the time that the officers came into your home and the time that you left the police station at 4:00 o'clock, at any point in that time frame, did you feel like you could get up and leave?
**A. No, because I asked could I go to the hospital, and they told me no. No one was telling us about how he was doing. Only way we found out something about him, because after they explain me -- after I was explained that homicide means someone was dead, and I guess that upset me even more, and all that was in my mind that he was dead, but the officer offered to bring us back home because we didn't have a way back home.**
**He the one that told us that he was in critical condition. We tried to go to the hospital, but they wouldn't let us in. So what I was telling him, I say, Well, they needed permission because he had surgery every other day. From March to June, he was having surgery every other day. And they had to have**



**permission. I had to sign papers, do this.**
**So when he was there those times, and I thank God that they went on and did what they had to do because they did tell me that they lost him twice. When he came in, he was dead, but they brought him back, and they lost him again, and they brought him back. The medicine that was administered to him to keep him alive is why he lost his toes and his fingers. I -- I apologize.**
Q. It's okay. I understand it's emotional.
Now, let me ask you -- now, how did you feel being present when the officers came in your home the way they did and shot your son?
**A. I was in a daze. I didn't know what's happening, why it was happening. I know he's been in trouble before, and that's only one time, but I knew he had got his life together. He had four children to take care of. And it's hard for him now trying to take care of four kids, but he's doing it.**
Q. Now, mentally, how have you -- how has it been after having that experience?
**A. I haven't had a good night's sleep in three years. I've been on machines to sleep. That's not working. I sleep during the day, and I'm up all night till it get to the point, that my kids and stuff, my**

**grandkids tell me, Grandma, you're a vampire.**
**No, Grandma not a vampire. Grandma just can't sleep, because it was a long time before someone could come to my door. I would tell them, You better knock at my door before you come in. The ones that had keys, I said, Just don't come in like that.**
**Now, rehashing all this over, I don't know. I have a lot of medical issues, too, and it ain't helping me none to keep rehashing this.**
Q. I just want to ask you just a couple more questions.
**A. Uh-huh.**
Q. Now, when you went down to the police station that night, did anyone ask you about the accident that you had in the police car?
**A. No. They didn't even let my granddaughter put shoes on. She was barefeeted, and it was raining when we got out of there. They didn't even let her put a shoe on.**
Q. How do you feel like the police officers treated your family?
**A. I think things could have been handled a little bit better than what it was. They could have told me something. They could have say, I got a warrant for such-and-such. Nobody told us.**



**To this day, no one has never talked to us and told us anything than what we try to find out for ourselves. No one has ever told us anything, the reason why or nothing.**
Q. Now, again, just to be clear, you stated that your son George had lived with you. Can you provide about an estimate?
**A. Oh, he had been with us about maybe five, six months, but they -- he was always there after him and his girlfriend broke up. They were living together, and he was always there. They always check on us all the time, but he had moved back in the house.**
Q. Okay. Just to clarify, is your testimony that your son Dominick was not living with you in 2013?
**A. No, because Dominick was -- Dominick was married at that time. I am trying to remember when he got -- when he was divorced. I -- I can't remember. I can't remember when he got his divorce.**
Q. Did Dominick ever spend the night at your house?
**A. Unless he would be drinking or something like that and I wouldn't let him drive, but it's been a while since Dominick spent the night.**
Q. So did Dominick spend a significant amount of time at your house for someone to believe that he lived



there?
**A. Oh, yeah. They there every day. All my sons are there every day. They come every day checking on us.**
Q. Okay. Now, you stated that at that time Dominick was married. And so him coming to check up on you, did that keep him away from his own home a significant amount of time?
**A. I know he -- they would come every day, him and my oldest son, they would check. They check every day. They still do that, because I get the dates and stuff -- I don't know when he had his -- got his divorce.**
**I don't -- I don't remember, but my granddaughter that lives with me that I raise is his daughter, so he'd be checking on his daughter and us because that's his daughter.**
Q. Do you believe he spent more time at your house than he did his own?
**A. You probably could say that.**
Q. And would he spend the night?
**A. No, not really. Huh-uh.**
Q. So his visits were just during the daytime?
**A. He come by there sometime at night when they be all sitting outside and drinking and playing music**



**and stuff like that.**
Q. Now, you were asked some questions about items that could have been in your home, those items specifically being a semiautomatic gun and drugs.
Isn't it correct that you stated that those things could not have been in your home?
**A. No, could not.**
Q. Why are you so sure that those items couldn't have been in your home?
**A. I was in the process -- we've been in the process for a long time trying to fix our house, and we are always -- my husband, he's a particular person. He's always checking everything, so no. There's no way in the world they could put nothing there, nobody, because he's always checking. He was always checking.**
Q. Now, with your son living there and your other son Dominick coming to visit, had you ever seen him bring anything in your home and not leave without it?
**A. Oh, no.**
Q. Just one more question. Just for clarity, the written statement you provided to Sergeant Bush, is the day that you wrote it and the day that you provided it to him different dates?
**A. I don't recall. I don't recall.**
Q. Okay. Now, at this time when this happened,

you stated that you were working at -- you were working as a suite attendant. Correct?
A. **Yes.**
Q. How often were you working then?
A. **It's a part-time job. I only work during rodeo time, which I work half of it, and football.**
Q. Now, how often did you work this part-time job after this incident?
A. **Like I say, I only -- when rodeo time is here, I do 10 days of that. Football, you've got one or two games per month, if you have two.**
Q. And so did this incident affect your ability to work?
A. **Well, it's part time, so it -- I'm up at night anyway, so, you know, it really doesn't hurt too bad then because I sleep during the day.**
MS. GADSON: I don't have any further questions.

FURTHER EXAMINATION
BY MR. CARNABY:
Q. I really will try to be brief, and I'm sorry I keep going over the same things --
A. **Uh-huh.**
Q. -- but I just want the record to be clear. On the evening of March 19th and morning of March 20th,



2013, the police never handcuffed you. Is that correct?
A. **No.**
Q. It's not correct?
A. **No, they did not. My mind was on before when they did come, you know, was arresting Dominick, and they did.**
Q. So there was another occasion when your son Dominick was arrested where you were placed in handcuffs?
A. **Yes. He was across the street, and I was asking questions, and the gentleman got mad because I was asking questions and slammed me on the car and handcuffed me.**
Q. With regard to the money that was in your purse, are you claiming that any money was missing that was taken by the police department?
A. **There was not any, no.**
Q. Are you saying the police didn't find all the money that was in the purse?
A. **Thank you.**
Q. All right. You testified before that someone told you that your son had died, was brought back, had died again, and was brought back again. Who was telling you that?



A. **It's the hospital. I was told when he was brought in with no pulse. And if --**
Q. Who -- who at the hospital is telling you that?
A. **The nurse say when he came in, he had no pulse, and they worked on him.**
Q. Do you know who the nurse was?
A. **No.**
Q. Anyone else tell you that?
A. **Well, the doctors told me they had lost him twice and brought him back.**
Q. All right. What doctors told you that?
A. **I do not remember the doctor's name.**
Q. Now, did they say they lost him at the hospital and brought him back, or that he had died before he came to the hospital and they brought him back?
A. **They -- the nurse stated when he got there, he had no pulse, and they brought him back. And from my understanding, the medicine that was administered to him to keep him alive is one of the reasons he lost his fingers because, I guess, he stayed on it too long.**
Q. All right. I'm not going to ask you how old you are because I know we're both getting older, but you had some health problems before this incident?



A. **Yes.**
Q. The issue that you talked about on cross-examination by your counsel was since this incident, you've had a loss of sleep?
A. **Oh, now, that just happened.**
Q. All right.
A. **But I have other health problems before then. Yes.**
Q. All right. And my question is, have you ever sought any specific treatment with regard to your inability to sleep?
A. **Yes.**
Q. And who have you been seeing for that?
A. **My doctors.**
Q. Do you know who the doctors are?
A. **She's no longer at St. Joseph's. What's her name? She put me on this machine, breathing machine. I had a couple of sleep tests done, and they put me on a machine.**
Q. Like a CPAP machine?
A. **Yeah.**
Q. Have you ever been an in-patient because of the problem?
A. **Other than the sleep --**
Q. So you were overnight for a sleep study at

some point?
A. **Yes. The sleep study, yeah.**
Q. Okay. Other than that, have you ever been in the hospital receiving treatment with regard to this issue?
A. **I've been in, but I'm trying to think what did I go in for. I forgot what I went in for now.**
Q. But it was something other than the sleep issue --
A. **Yeah.**
Q. -- arising out of this incident?
A. **Yes.**
Q. Okay. As a result of this incident, you're not claiming any lost income, are you?
A. **No. I wasn't working full time anyway.**
Q. But you haven't lost any ability to work after this incident that you would have worked otherwise?
A. **I had cut back on my rodeo. The rodeo is 20 days. I only do 10 now.**
Q. Okay. Was that because of this incident?
A. **Yes.**
Q. So back in -- I'm sorry to talk over you.
A. **Go ahead.**
Q. Back in March of 2013, you were doing 20 days?
A. **Uh-huh.**



Q. All right.
MR. CARNABY: I have no further questions.
MS. GADSON: No further questions for me.
(At 3:03 p.m., the deposition was concluded.)



CHANGES AND SIGNATURE

PAGE LINE CHANGE REASON

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

____________________

ELIZABETH GONSOULIN



THE STATE OF TEXAS :

Subscribed and sworn to before me, the undersigned authority, by the witness, ELIZABETH GONSOULIN, on this, the _______________ day of ______________, 2016.

__________________________

Notary public in and for
the State of T E X A S

My Commission Expires:

73

THE STATE OF TEXAS :
COUNTY OF HARRIS :

REPORTER'S CERTIFICATION
TO THE DEPOSITION OF ELIZABETH GONSOULIN
TAKEN ON MAY 17, 2016

I, Cherlyn K. Mann, a Certified Shorthand Reporter in and for the State of Texas, hereby certify that this deposition transcript is a true record of the testimony given by the witness named herein, after said witness was duly sworn/affirmed by me.

I further certify that I am neither attorney nor counsel for, related to, nor employed by any of the parties to the action in which this testimony was taken. Further, I am not a relative or employee of any attorney of record in this cause, nor do I have a financial interest in the action.

Further certification requirements pursuant to the Rules will be certified to after they have occurred.

Subscribed and sworn to on this, the 23rd day of May, 2016.

Cherlyn K. Mann
Cherlyn K. Mann, CSR
Certified Shorthand Reporter
in and for the State of Texas
Certification No.: 5461
Expiration Date: 12/31/16
Firm No. 47
7838 Hillmont Houston, Texas 77040
713/647-5100

74

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

GEORGE BERNARD :
Plaintiff, :
:
VS. : No. 4-15-cv-00734
:
CITY OF HOUSTON, ET. AL, :
Defendant. :

AFFIDAVIT

I, Cherlyn K. Mann, do hereby certify that I was the officer before whom the oral deposition of ELIZABETH GONSOULIN was taken on May 17, 2016.

I do hereby further certify that on__________

______ the original signature page of the deposition was submitted to_________________.

____ the original deposition was submitted to __________________ for examination and signature.

_____ notification was given to______________ that the original deposition given in the above cause was complete and ready for examination and signature at the offices of Carol Davis Reporting, Records & Video, Inc., within thirty days of said date.

_________ More than thirty days have elapsed since the above submission. The original

75

deposition together with all exhibits is being forwarded to ____________________ on__________________.

______ More than thirty days have elapsed since the above submission of the original deposition and it has not been returned to the offices of Carol Davis Reporting, Records & Video, Inc.

______ The original deposition has been signed or the original signature page was signed and notarized. The attached page(s) contains changes, if any, made by the witness and the reasons therefor. The original deposition together with all exhibits is being forwarded to ____________________ on____________________.

That a copy of this Affidavit was served on all parties shown herein, pursuant to information made a part of the record at the time said testimony was taken.

FOR THE PLAINTIFF:
Ms. Chareka M. Gadson
GADSON LAW GROUP, PLLC
405 Main Street, Suite 455
Houston, Texas 77002
Phone: (713) 489-1851
Fax: (281) 501-6777

76

FOR THE DEFENDANT:
Mr. Henry N. Carnaby
SENIOR ASSISTANT CITY ATTORNEY
900 Bagby, 4th Floor
City Hall Annex
Houston, Texas 77002
Phone: (832) 393-6491
Fax: (832) 393-6259
E-mail: Henry.carnaby@houstontx.gov

SUBSCRIBED AND SWORN TO on this, the ________ day of ___________, 2016.

________________________
Cherlyn K. Mann, CSR
Certified Shorthand Reporter
in and for the State of Texas
Certification No.: 5461
Date of Expiration: 12/31/16
Firm No. 47
7838 Hillmont Houston, Texas 77040
713/647-5100