IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

GEORGE BERNARD )
ELIZABETH GONSOULIN, )
Plaintiffs, )
)
vs. ) CIVIL ACTION
) NO. 4:15-cv-00734
CITY OF HOUSTON, )
FERDINAND RODRIGUEZ, JR., )
EDUARDO MEDRANO, GERALD )
GOINES, JR., CIRO )
OLIVARES, WILLIAM DAVIS, )
SHANTA MORTON, STEVEN )
BRYANT, JOHN DOES 1-3 IN )
THEIR INDIVIDUAL AND )
OFFICIAL CAPACITIES, )
Defendants. )

ORAL DEPOSITION
FERDINAND RODRIGUEZ, JR.
July 13, 2016

ORAL DEPOSITION OF FERDINAND RODRIGUEZ, JR., produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on the 13th day of July, 2016, from 1:18 p.m. to 2:33 p.m., before Laraine L. Toliver, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of the City of Houston, City Hall Annex, Legal Department, 900 Bagby, 3rd Floor Conference Room, Houston, Texas 77002, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



APPEARANCES

FOR PLAINTIFFS:
Chareka M. Gadson, Esq.
Gadson Law Group, PLLC
601 Sawyer
Suite 200
Houston, Texas 77007
Telephone: 713.229.9997
Fax: 281.501.6777
E-mail: charekagadson@gmail.com

FOR DEFENDANTS:
Henry N. Carnaby
Senior Assistant City Attorney
City of Houston Legal Department
900 Bagby Street, #333A
Houston, Texas 77002
Telephone: 832.393.6309
Fax: 832.393.6259
E-mail: henry.carnaby@houstontx.gov

ALSO PRESENT:
George Bernard

REPORTED BY:
Laraine L. Toliver, TX CSR



INDEX

PAGE
Appearances .......................................2
FERDINAND RODRIGUEZ, JR.
Examination by Ms. Gadson .........................5
Signature Page ...................................50
Court Reporter's Certificate .....................51

EXHIBITS

(None offered)



THE REPORTER: Today's date is July 13, 2016. We are on the record at 1:18 p.m. This is the deposition of Ferdinand Rodriguez, Jr., being heard before the United States District Court for the Southern District of Texas, Houston Division, in Civil Action No. 4:15-cv-00734, George Bernard and Elizabeth Gonsoulin, Plaintiffs, versus City of Houston, Ferdinand Rodriguez, Jr., Eduardo Medrano, Gerald Goines, Jr., Ciro Olivares, William Davis, Shanta Morton, Steven Bryant, John Does 1-3 in their individual and official capacities, Defendants.

My name is Laraine Toliver, certified shorthand reporter, here on behalf of Esquire Deposition Solutions, 1001 McKinney, Suite 560, Houston, Texas 77002.

Will counsel please introduce themselves and their affiliations for the record, then the witness will be sworn.

MS. GADSON: Yes. My name is attorney Chareka Gadson. I am the attorney for the plaintiffs.

MR. CARNABY: Henry Carnaby. I'm a senior assistant city attorney, representing the defendants.

FERDINAND RODRIGUEZ, JR.,
having been first duly sworn, testified as follows:

Page 5

EXAMINATION
Q. (BY MS. GADSON) Mr. Ferdinand, can you please state your full name for the record?
A. Yes, it's Ferdinand Rodriguez, Jr.
Q. Okay. And how long have you been a police officer?
A. Twenty-four years now.
Q. What divisions have you worked in?
A. I've worked in patrol out of the academy, then community services as a D.A.R.E. officer, then back in Southwest Tactical Unit, and then narcotics since '99 to current.
Q. Now, how long was your tenure as -- how long was your tenure in the community services division?
A. Oh, I believe it was about three years.
Q. Okay. And what did your duties include?
A. I was a D.A.R.E. officer.
Q. Okay.
A. I went to the schools and taught D.A.R.E. to the -- whatever schools I was assigned to.
Q. Okay. And what is your educational background?
A. It is a high school diploma, with a few hours short of a bachelor's degree in college. Some college.
Q. Did you attend college prior to becoming a police officer?

Page 6

A. No. Well, maybe a year's worth of college right after high school, and in between I went into the service.
Q. What -- what branch of the military were you in?
A. United States Army.
Q. What was your highest rank?
A. Sergeant.
Q. And what unit were you in?
A. I was in the 82nd Airborne and the 20th Special Forces.
Q. Officer Rodriguez, have you ever had any complaints filed against you?
A. Yes, I have.
Q. What were those complaints that were filed against you for?
A. Back in I believe 1994 or 1995 -- I don't recall when -- I had an excessive force, theft, and official oppression complaint, one complaint. Those were the complaints against me in one.
Q. And what were the allegations in the excessive force case?
A. That we hurt him. It was -- he was resisting arrest and he fought us.
Q. And, so, the allegations were that the

Page 7

individual was hurt by you all and you all used excessive force, and your defense was that he was a -- was resisting arrest and he was fighting?
A. That's correct.
Q. Were you disciplined for that complaint?
A. No.
Q. What were the allegations in the official oppression complaint?
A. I believe this is the same suspect, said that -- if I recall correctly, that we stopped him for no reason.
Q. What was your defense?
A. We stopped him for a reason, because he ran from us. We just stopped to talk to him and he ran. And we chased on foot, and when he was caught with his backpack on his back, he fought us.
Q. So your initial contact with him was to speak with him?
A. Yes.
Q. So your initial contact with him was not to arrest him?
A. No.
Q. And, so, when you say he was resisting arrest, what was he going to be arrested for?
A. For running, for -- for fleeing on foot, on

Page 8

detention. We wanted to talk to him. And when he ran and we caught him, he turned around and started fighting us and kept reaching for his backpack --
Q. So he --
A. -- in which two pistols were recovered and ounces of cocaine.
Q. So, Officer Rodriguez, you believe that running is against the law?
A. No.
Q. Did you prior to -- was your conversation going to inquire into the contents of his backpack?
A. No. That only came into question after he continuously guarded it.
Q. Did you smell anything?
A. No.
Q. You just became suspicious because he seemed to not want you all to mess with it?
A. It was in a high crime dope area, yes, where we frequently had people with crack cocaine.
Q. Is it your belief that anybody in a -- a high -- what did you call it?
A. Crime area.
Q. -- high crime area is doing something illegal?
A. No.
Q. Is it your belief that anybody who is in a high

Page 9

crime area should be subjected to a Terry frisk?
A. No. There's lots of good people in high crime areas.
Q. Officer Rodriguez, how did you prepare for this deposition?
A. I looked over my statements from back in 2013, my initial statement, my internal affairs statement, and then I spoke with my counsel.
Q. Now, you do recall the events that took place on March 19th, 2013, correct?
A. Yes.
Q. Now, prior to going to the home at 6725 Sherwood Drive, did you have a briefing?
A. Yes, we did.
Q. And what did that briefing consist of?
A. It consisted of the case agent going over the location, as to what type of narcotic search warrant we would be conducting. Also consisted of the tactical -- the tactics we would be using to approach the house on this no-knock warrant.
Q. And what kind of tactics were you all told you would use?
A. We weren't told we were going to use the tactics. We, myself and Officer Medrano, being the two guys that lead a lot of these search warrants, lead our

Page 10

squad into the -- into the locations. We do surveillance on the location and we make observations, and, based on those observations, we decide what kind of hard entry we are going to use; i.e., let's say, if it looks like a hostile environment and unfriendly, as we go in we would use flash bangs, the concussion grenades. In this situation, when Ed and I were conducting surveillance, we noticed it was across the street from an elementary school, and we also saw that there was elderly people at the location, so we opted not to use any kind of incendiary device or flash bang and just make hard entry into the house.
Q. And when did you all do the surveillance?
A. Earlier that afternoon. I don't recall the time exactly.
Q. And Officer Medrano was with you?
A. Yes, he was.
Q. What other research did you do prior to -- I withdraw that question.
What other research did you do pertaining to the -- the search warrant?
A. That was it. Our job was to look at the location and determine what would be the best way to enter, which would -- we decided was going to be the front door.

Page 11

Q. Did you do any research on the subject of the warrant?
A. No. I was not the case agent. The case agent usually handles all that.
Q. And you all were not provided with any photographs of the subject of the warrant?
A. No, we weren't.
Q. Officer Rodriguez, when did you make -- how many statements did you make regarding the incident on March 19th?
A. I believe just the two, which was the initial -- my initial statement to homicide, which was I believe at 2:00 in the morning or something, and then later on, I don't know how many weeks or -- or when, how long it took, but the internal affairs statement was made.
Q. And you've had time to review that statement?
A. Yes, I have.
The second one, the internal affairs statement?
Q. No, the -- the statement that you made --
A. Initially?
Q. Yes.
A. On the night of?
Q. Yes.

Page 12

A. Yes, ma'am.
Q. How did you all enter the home, Officer Rodriguez?
A. We entered the home through the front door, using a battering ram.
Q. And why did you think you needed the battering ram?
A. Because we have a no-knock warrant and that is standard protocol for a no-knock warrant.
Q. Was the door open or closed?
A. As far as I remember, it was closed, because I believe our mob -- we call them the mobi-man, the guy using the battering ram, he hit the door, and I was the first one through the door.
Q. Okay. Now, you were the first one in the -- the home, and what is your duty as the first officer to -- to breach the doorway?
A. As I come through the threshold, my -- my duty is to observe and order people to show their hands and to see that there's not an initial threat in front of me. When -- it's a tactic -- how to explain.
We have enough to look at whenever we -- not knowing what's behind the door, so, when we come in, it's a quick observation of people we encounter. We immediately order to show hands and get down on the

Page 13

ground. The rest of my squad is -- behind me is normally yelling "Police, search warrant."
Q. Okay.
A. We feel -- when we train, we feel like if we're yelling anything besides what we're looking at and those people that we're talking to, there's too much going on to process everything that we see plus start yelling "Police, search warrant" on top of, so I don't yell that when I'm running point.
Q. Okay. Let's go back.
A. Yes.
Q. When we talked about the -- the tactical plan --
A. Okay.
Q. -- did you all have any conversations about any weaponry?
A. Yes. We were notified in the -- in the briefing that -- that there was dope at the location and weapons had been seen at the location. I don't recall if they said it was a shotgun or whatever weapons. We just knew that weapons were seen at the location, which usually justifies us to get a no-knock search warrant.
Q. Are weapons a -- the -- the search and locating of any weapons, is -- is that a priority when you are executing a search warrant?

Page 14

A. Okay. Repeat your question again.
Q. When you are executing a search warrant --
A. Yes, ma'am.
Q. -- is looking for weapons as you walk in, is that a priority?
A. On first visual, yes.
Q. And that's the -- the purpose of -- of you looking to make sure that people's hands are clear?
A. Correct. We're -- we're ordering people to show us their hands.
Q. Do you look in the -- when you are executing a search warrant, you don't know where anyone will be located?
A. Correct.
Q. And, so, is part of the procedure to scan the individuals, the areas where they're seated?
A. Where they're seated?
Q. Or wherever they are located when you walk in?
A. Okay. Yeah, it's kind of hard to explain, so I'm going to try to explain it so that -- let's say if I come into the room right now on a search warrant and I visualize you and I say "Put your hands up," not only when you put your hands up like this (indicating), I'm looking around you to see if there's a pistol. If you don't comply, then I will stay with you and I will hold

Page 15

down on you until I get support to where I can handcuff you to make sure, because there could be a pistol or sometimes there's a gun right there. If you're not an initial threat to me, I will pass you, since I'm the point man, and the next person, whoever, as it goes down the line, as long as they stay like that and comply with the officer's commands, usually somewhere down the line in the -- we call it the stack will hold that position and watch those suspects right there until the whole house is secured.
Q. Okay. So, when you are -- when you're executing a search warrant and you walk in and you see an individual and you see his hands, you -- is that the point where you scan the area around the individual for any weapons?
A. It's such a fluid -- this whole thing is so fast and dynamic, so I'm going to ask you to please ask me one more time --
Q. Okay.
A. -- so I -- because I want to get a good, clear, precise answer for you.
Q. Because you -- you answered my previous question in two parts. You said the first step when you walk in and encounter individuals during the execution of a search warrant, you are immediately checking their

Page 16

hands to make sure that there is no weaponry, correct?
A. Well, we're scanning, right.
Q. Okay.
A. It's a quick scan to see, and compliance is what we're looking for.
Q. Okay. You're looking for compliance?
A. Right.
Q. So, then, once his hands are in the air and he is complying, do you scan the -- the area around that individual?
A. If he seems -- and -- and it all depends on my opinion or whoever is running point.
Q. Uh-huh.
A. If they're not a threat at that point, we will pass that person, if they're being compliant, and somebody down the group -- because we have the rest of the house to secure, we'll pass them up. If they're perceived by the point person, which in this case was myself, then I would stop right there and hold what I have, and the rest of my crew would -- will continue if I feel like there's a threat of more than just leaving you there.
Q. Okay. And, so, if he is perceived to be a threat, then what is the -- what's the next step, if he's not compliant?

Page 17

A. If he's not compliant, we call for support. And we usually go what's going -- we say "Hands on," and somebody covers while the other person will handcuff.
Q. When you walked into the home on March 19th, who did you see?
A. I saw two elderly people and Mr. Bernard.
Q. And where were they located?
A. In the -- as I entered, they were along the left side wall of -- of the house in the living loom.
Q. When you say "they," who is "they"?
A. There was three individuals. There was a -- I guess it was his mom, dad, and him. I believe Dad was first, closest to the door, if I recall. I -- but -- and he was the third person, furtherest away from the door, along the same wall, next to them in the -- they were sitting in chairs and I believe he was standing right there.
Q. So, Mr. and Mrs. Gonsoulin were sitting in chairs and Mr. Bernard was standing?
A. Yes.
Q. Now, what was the first thing that you did upon seeing the three individuals in the -- in the living room?
A. "Let me see your hands. Get down on the ground" is what I will normally -- is my normal command.

Page 18

Q. And who were you directing that to?
A. The three of them as I came in.
Q. Okay. And did Mr. and Mrs. Gonsoulin get on the ground?
A. They complied. As I -- as I said that, they immediately put their hands up and the -- Mr. Bernard did not comply. He didn't put his hands up. He just immediately turned to the right and started moving back toward the kitchen, and was moving away as I continued to yell "Let me see your hands."
Q. And what happened next after you told him "Let me see your hands"?
A. He continued to look over his left shoulder, moving away from me, running through the dining room toward the kitchen, and he would not stop. I kept -- at this point, I'm saying, "Stop. Let me see your hands. Stop." And he had his hands in front of him, looking over his shoulder doing like this (indicating) the whole way as he's going. He gets to the threshold of the kitchen and he ducks automatically left, like that way.
And since he wasn't complying with the commands from the living room through the dining room, and now we have there -- that's when I had a really bad feeling and I move my AR-15 from safe to fire and moved to the left to take cover, because I felt like this time

Page 19

at -- at -- he was either -- going to stay behind the wall and barricade. I would not go through the threshold, or my partner. This is a hold, slow down. This guy is on the other side of the wall, we don't know what he has, or it's one of these moments where you're thinking fast and you don't know what to do.
So, when he -- as I moved left, all in a matter of seconds he jumped back out and, to me, was making a movement like he was coming out with something from his left side, and that's when I moved the AR-15 from low ready up and I shot.
Q. And, so, as soon as you -- as soon as you came into the door, you seen him start reaching into his waist band?
A. He stood up -- can I show you? Or I'll explain as I show, but I'll just kind of show you. His -- let's say you're where I'm at. Mom and Dad were right here to his -- to his right, and he turns around and he goes like this (indicating) and just starts running. He turns to the right, I do remember that. So, he's looking over his shoulder the whole time, running, messing with the -- with the front of -- and I'm constantly saying, "Stop. Let me see your hands. Stop." He would not stop. He would not comply with my commands.

Page 20

And then in that half a second that he disappeared and went left through the threshold, I went from safe to fire, not knowing what would happen next, and he popped back out. And when he popped back out, that's when I took a shot, when he was -- when he was coming out with what I thought was a weapon --
Q. So --
A. -- from his waist band.
Q. So, during the time -- about how many steps do you think he ran?
A. I don't know. I didn't measure all that stuff out. The -- the distance of a living room, so maybe from -- from this wall to that wall maybe. I don't know how many steps that is.
Q. Was it a long distance? Would you consider it a long distance?
A. It was long enough to where he should have stopped. It would have avoided a shooting.
Q. So, the whole time he was running, he was reaching into his waist band?
A. He was holding the front of his waist band like he was holding something.
Q. He was holding the front of his waist band?
A. Yes, ma'am.
Q. And then you stated that he disappeared to the

Page 21

left once he entered the -- the kitchen, correct?
A. Right, once he entered that threshold.
Q. Okay. And, so, when he came back, he was still reaching into his waist band?
A. Right. So, it wasn't -- when -- when I say disappeared, from my point of view where I was coming at him, mind you I'm closing distance, and all within a matter of seconds he comes in and then comes back out. So, the top of his torso and everything I could not see. And when he comes back out, he comes out kind of like a -- on a backward motion like to -- to spin around, like this (indicating).
Q. So --
A. With his left hand like as if he was pulling something from his waist band.
Q. So, you say he walked backwards into your -- your sight and he kept his back to you?
A. No, it was to the side.
Q. He was to the side.
A. Because I shot him right here (indicating), so it was to the side. In other words -- oh, man, it's hard to -- the wall is right here, and if you can imagine a wall being right here and I'm Mr. Bernard and I come in like this and then come back out like that (indicating), that's what I saw. And that wall is right

Page 22

there. So, the minute that happened, so --
Q. So he looked like he was pulling from --
A. Exactly.
Q. In that motion?
A. In this motion.
Q. Using that hand?
A. Using this hand (indicating).
Q. Okay.
A. I mean, that's all I could tell.
Q. So, after he stepped back sideways in front of the door and you seen him motioning by his waist band, what happened next?
A. I fired the shot and he fell back behind the wall, the same wall that he was -- just came out from, and I took cover on the opposite side of that wall. And my partner, Ed Medrano, heard the shot. He went to my right side of the room and was able to see his feet. He asked me if I -- if I was shot and I said, "No, I shot the suspect." And I said, "Can you see if he's holding a gun?"
And Officer Medrano was attempting to what we call slice the pie, try to get a view without exposing himself -- it's a tactical thing that we do -- without exposing himself in case he does have a gun and he's pointing. And he could see and I could see his

Page 23

feet kicking. And Officer Medrano kept saying, "Let me see your hands. Let me see your hands." And he was in pain. At that -- at that moment, Ed said -- Ed said, "He's not -- he doesn't have a gun."
The rest of the squad -- I already put on the radio, "Shots fired. Suspect is down." The rest of the squad came up, and we still had house to clear to -- to make sure that there was nobody else in the house that we would have to worry about. So, Ed Medrano and Officer Steve Bryant went in through the threshold to the right, cleared the rest of the house, and I stepped over Mr. Bernard and I covered Mr. Bernard. As I covered -- there was a room back there to the I guess left of the kitchen, with a lot of articles, and I just -- I guess I just straddled over where he was and covered down and waited for them to clear. And as soon as they cleared, I let my weapon hang and I checked Mr. Bernard's waist band. And we moved him away from the -- from the dog kennel. There was like a dog kennel there. We moved him away and we -- I lifted him to see -- and I saw a lot of blood and we immediately, you know, called for an ambulance.
After the house was cleared, we called for the ambulance to come. And after that, some of the guys took their first aid -- first aid kit out and got some

Page 24

dressing to -- to address the wound. And I think it was Shanta, she -- she said, "Come on, Fred, let's -- let's go to the van." And I let the other officers and my sergeant take over and I was isolated in the van. I went back to the -- to the raid van.
Q. Okay. Now, when you say "cover down on the suspect," what are you doing as you -- when you cover down?
A. Basically, when -- when I say "cover down," I'm concerned about an area that we haven't searched or we have no visual, so I don't know if anybody is hiding with a gun or anything. We don't -- we don't know what's in the unknown. So, I cover down over Mr. Bernard, meaning I've got the weapon pointed. In case somebody shoots, I am standing pretty much over him and I'm -- whenever we shoot a suspect in a narcotics search warrant or if something like that happens, we stay with our suspect. It's like we're responsible for them until we get relieved. So, anything else, any clearing the rest of the squad has to take care of and I stay with him, and that's what I did.
Q. Okay. And, so, you felt comfortable standing over Mr. Bernard?
A. Yes, I did at this point. He was, unfortunately, in a lot of pain. With my gun pointed

down over the room, not like pointed down at him, but over the room.
Q. Okay. And, so, before you covered down -- oh, no. When did you check his waist band?
A. After the -- after the -- the rest of the house was cleared to -- to my right, the other side of the kitchen and the kitchen, which was within seconds, because usually a whole clearing of the house is pretty much under a minute, if we do it effectively and do it correctly.
Q. And what were you looking for?
A. At what point, ma'am?
Q. I'm sorry. When you were checking his waist band?
A. Oh, I was looking for a weapon. It's a -- it's a high -- we call it a high risk search. It's an immediate search. And when I checked his waist band, he was -- he was definitely hurting in the abdomen area and I -- so I pulled his shirt up. I could see where I -- where I shot him. And we moved him away so that we could start -- away from where he initially fell down so that we could administer first aid.
Q. And you said there was a dog kennel close to where he was laying?
A. As I recall, yes.



Q. What side?
A. What side was -- was --
Q. The dog kennel?
A. It was the same side, left side.
Q. Did you see anything else that was, you know, obstructing him or around him as he laid there?
A. Behind him there was a lot of clutter. There was -- I don't know how you'd -- just a lot of clutter, lot of stuff that would be thrown in a room, like a junk room I guess. And he was laying at the base of it, right at the base of that dog kennel, just on the other side of the wall. So, maybe there was like this much room beside -- beside that wall, maybe two feet of where he went down. Because, like I said, his feet were sticking out in the threshold.
Q. His feet were -- was his body in two rooms or just in one, the way he was laid?
A. It was mostly in -- in one, in -- okay. So, like he was up against the threshold, where both of his feet, I could see from like his knees down when he was kicking. The rest of him was toward the dog kennel, which is the left side of the -- of that room. So, he was nowhere -- he was definitely inside -- I don't know if you call that the kitchen or that junk room, because it was kind of a wide open area, but he was in that,



that room, the beginning of the kitchen, but yet next to where all the stuff was.
Q. So, was his body laying perpendicular or parallel to the kitchen door?
A. I would say parallel or even. I mean, going across.
Q. When you seen -- when you say that you seen Mr. Bernard reaching to his waist band, you were concerned that he had a weapon?
A. Yes, ma'am. At the -- at the point that -- when he wouldn't stop and now he's going around the corner, that's -- I -- I don't know how to explain the -- the type of training that we do, but whenever I -- we run a warrant with our AR-15's, we run our warrants in safe mode, and we practice safe to fire, depending on the threat level. And if I go into -- when the search warrant is over and I'm in fire mode, meaning my next point is to pull the trigger, then to me I assessed the threat level as becoming serious.
Q. Okay. So --
A. And that didn't happen until I got into that dining room.
Q. So, once you got into that dining room, you thought that there was a threat of something serious?
A. Yes, ma'am, the minute he -- he ducked, like



that half second ducked away in that threshold.
Q. And is that the moment that you say that you started fearing for your life?
A. Yes, ma'am. Well -- well, when he stepped back out --
Q. Okay.
A. -- in the manner that he did.
Q. So, during this -- how long did this -- how quickly did this happen?
A. Like I said, under a minute. If a -- if we run a search warrant, under a minute is usually pretty long. From the time that we entered the door, probably to the time I engaged him, it might have been 20 to 30 seconds.
Q. And, so, those 20 to 30 seconds were pretty intense for you, correct?
A. Yes, ma'am.
Q. Now, you didn't go in feeling that the situation was intense? It wasn't until you felt like there was a threat, correct?
A. Not correct. Every search warrant I run is intense because we're going into the unknown.
Q. Uh-huh.
A. It -- it really is.
Q. Uh-huh.
A. But we also take great pride in the skill

Page 29

that -- that -- that we do and the training that we do to contain ourselves from foolishly shooting somebody.
Q. Now, as you covered down on him, did you point your gun at him?
A. No. And -- so that I paint a good clear picture, because I -- it almost sounds like you're saying covering down like I'm pointing my gun at him. No, I'm covering over him, almost as protecting him from anybody else that might shoot toward our way, because we don't know still what kind of threat lies beyond him, so that's what I was doing.
Q. Okay.
A. Covered down on the room, standing over him, covering down on the room until they cleared the rest of the house.
Q. So, after you were standing over -- no, after you approached Mr. Bernard, did you see his hands?
A. When he was on the ground, is that what we're talking about? Yes, I could see his hands. He was grabbing at his abdomen. He was -- he was doing this, (indicating) like he was in pain.
Q. And did you see a weapon around Mr. Bernard?
A. No, I didn't.
Q. Once you seen him laying on the ground, did you search the vicinity around him?

Page 30

A. No, I didn't. My -- my main concern -- and honestly, at this point, when the house is deemed clear, I -- I'm no longer covering down on him. I am moving him to do a quick high risk assessment search, making sure he didn't have anything in his waist band, and then administering to the -- to the gunshot wound.
Q. So you weren't concerned about him possibly being able to reach close to him for the weapon that you didn't find in the waist band?
A. I didn't see that. I was not concerned about that. He was in too much pain.
Q. And, so, after being concerned about him reaching into his waist band, then being concerned about him going around a corner and then coming back, reaching into his waist band and fearing for your life, you weren't concerned about checking the area around him for any possible weapon?
MR. CARNABY: Objection to the compound form of the question.
MS. GADSON: I'll restate the question. I withdraw the question.
Q. (BY MS. GADSON) Officer Rodriguez, were you concerned about seeing Mr. Bernard reach into his waist band when you first walked into the home?
A. Yes, I was.

Page 31

Q. Were you concerned about Mr. Bernard moving toward the kitchen, reaching into the front of his waist band?
A. Yes, I was.
Q. Were you concerned when Mr. Bernard went around a corner?
A. Yes, I was.
Q. Were you concerned when he came back into your view?
A. Yes, I was.
Q. And were you concerned when he started reaching into his waist band as if pulling a weapon?
A. Yes, I was.
Q. Did you fear for your life?
A. Yes, I did.
Q. And you shot Mr. Bernard, correct?
A. Correct.
Q. But when you walked over his body, you were not concerned about any possible weapon that would have been in his vicinity?
A. No, I wasn't. My partner said that he was -- he didn't see anything. I trust my partner with my life. And when we entered that room, it was because we felt like there was no initial threat around him and he was in too much pain to do anything.

Page 32

Q. And what partner told you that there was no weapon?
A. Officer Medrano. He had the -- he was slicing the pie. He -- he could look over and see that he was just holding, and we made the decision to move on.
Q. And when you say you trust Officer Medrano, what do you trust Officer Medrano with?
A. Well, as we're running these search warrants, we trust each other with our lives.
Q. So, when someone tells you that there is no gun in the vicinity of a suspect, you believe him?
A. In this point, it's a fluid -- it's -- it's fluid. I have to believe him. We still have a mission to do.
Q. Who was the first officer to approach Mr. Bernard as he laid on the ground?
A. Me. I was. And I didn't see a weapon.
Q. And who approached Mr. Bernard with you?
A. Everybody kind of went by, and I want to say it was either -- I'll be honest with you, I don't recall. I don't recall, because we -- collectively, we moved him. It wasn't just me. We moved him away from that dog kennel.
Q. And when you say "we," who is "we"?
A. The guys in my squad. It was either

sergeant -- not sergeant. It was either Officer Medrano or I -- I mean, it's speculative. I don't recall. I was looking down and I was -- the guy was shot.

Q. So you were just looking down at the guy that you shot?

A. I moved him. We were -- our next job after calling the ambulance was to administer first aid.

Q. You administered first aid?

A. No. I helped move him. Somebody else was already getting their -- their first aid deal out and they were going to apply gauze until the ambulance got there. And then I -- I left after the house was secured.

Q. So, just to be clear, about how long do you think that you were around Mr. Bernard's body once you began -- once you approached him until you walked to the front door away from the suspect?

A. Less than a minute or a minute maybe. I wasn't there long.

Q. So, it took you less than a minute to cover down over him while other officers cleared the kitchen and the rest of the home and moved the suspect, checked his waist band, and get on the radio? That took you one minute, less than a minute?

A. Yes, ma'am. We can clear a house in 30 seconds



without any incidents. I'm -- I don't know for sure, but I'm pretty sure it was under a minute or a minute.

Q. Do you recall giving another statement after March 20th?

A. Internal affairs statement I think is the only other one I gave.

Q. Okay. And how did you produce that statement?

A. I sat down and I had to think about everything that happened and I reviewed my statement that I gave to homicide.

Q. And then what did you do?

A. I wrote my letter. Well, I -- I guess we have a 48-hour notice. We have a written 48-hour notice that they give us and we counsel with our attorneys, based on whatever questions internal affairs asks.

Q. Did you hand-write it or did you type it?

A. Typed it.

Q. How did you produce the first statement on March 20th?

A. Typed it in homicide division. I think it was like 2:00 in the morning.

Q. Uh-huh. And, so, you typed the document, you typed your March 20th statement in homicide, and where did you type your administrative statement?

A. Probably at the union hall, with the attorneys



at the union hall.

Q. With the attorneys?

A. Yes. Or up at the attorney's office. They have like an area, a work room.

Q. Uh-huh. Now, you said at this time that you created your administrative statement, you said you -- you thought about what you said, what happened, and then you looked at your voluntary statement from March 20th?

A. Yes.

Q. So you had access to it during the time that you were creating your administrative --

A. Yes.

Q. -- statement?

So, is that the reason why the voluntary statement and the administrative statement is identical in regards to what happened on March 19th?

A. Yes, ma'am.

Q. Did you copy and paste it?

A. No, I don't think I did that.

Q. Did you sit at the desk and copy word for word from the other statement?

A. I don't recall.

Q. When you were growing up, did anyone ever compliment you on your stellar memory?

A. Not that I can recall. I wasn't like the



brilliant kid in school.

Q. And, so, do you think it would be odd that a statement would be exactly the same three months apart?

A. No.

Q. You don't think it would be odd to have the same exact words?

A. No. A statement then is the same statement that it is today. I --

Q. Do you think it would be odd to have the same grammatical errors?

A. I guess if it has grammatical errors it has grammatical errors.

Q. In both statements, in the exact same place, do you think that's odd?

A. Yeah. I mean --

Q. Do you think it would be odd to have the exact same punctuation errors in two statements three months apart?

A. I guess.

Q. And you're still stating that you didn't copy and paste your statement from March for your administrative statement in June?

A. I don't recall doing that, honestly.

Q. But do you recall typing up your administrative statement off of your memory?

Page 37

A. No, I used the other one as a guideline.
Q. As a guide?
A. I mean, I always -- if -- it is what it is. It's right there and I -- and when you go to internal affairs, I mean, you don't want to -- you want to refresh your memory of the time. It's kind of like when I go to court on something that happened three years ago, I don't go into court and sit there and go, well, I don't remember what I put in my report, because it's not fresh in my mind. Whenever I read stuff like that or other reports that I've done, it kind of brings me back to this place, to that moment when I was there, and...
Q. And, so, bringing you -- once you refreshed your memory of your voluntary statement on March 20th and typed up your administrative report -- excuse me, your administrative statement on June 24th, which is pretty much a little over three months later, when you refreshed your memory, it brought you back to a place so clearly that you were able to type up a statement that completely mirrored everything that you said that happened on March -- in your March 20th statement?
A. What would change? Yes. What would change? There would be nothing that changed. It happened that way it happened.
Q. So, the facts wouldn't change. We can agree on

Page 38

that, correct?
A. The facts? Sure.
Q. The facts could change?
A. Are we not agreeing on the facts or what? I don't -- I don't understand your question.
Q. Let me rephrase my question. So, you're stating that you refreshed your memory on -- to prepare to write your June 24th administrative statement, correct?
A. Yes.
Q. And you're stating that --
A. I used the original statement, yes.
Q. And, so, you refreshed your memory so well that when you sat down to type your administrative statement it was word for word exactly what you said March 24th, word for word?
A. I guess it was.
Q. And, so, on -- by June 24th, a guy who admits that he wasn't the brightest student in class was able to produce a document that completely mirrored the facts pertaining to an incident that happened on 3-19? On June 24th, you were able to bring forward a mirrored report?
A. A statement, mirrored statement, yes.
Q. A mirrored statement?

Page 39

A. Yes.
Q. Now, in regards to what happened after your exit from the home on March 19th, your statement on June 24th discusses that you were later informed that a pistol was found near where the suspect fell in the kitchen. Who informed you of that?
A. I believe it was my supervisor, Sergeant Davis.
Q. Did you feel like a failure when you found out that there was a pistol found next to him that you didn't see?
A. No.
Q. Did you feel disappointed in Officer Medrano, who you trust with your life, when you found out that a pistol was found that he didn't see?
A. No, I'm not disappointed in Officer Medrano.
Q. About how long after your -- about how long after were you notified, after you left the home -- well, walked out of the front door, were you notified that a pistol was supposedly found next to Mr. Bernard?
A. I don't recall.
Q. Was -- was that the only -- the information regarding what you were informed of by your team members, was that the only information that you typed from memory on June 24th?
A. What information? What's on the paper?

Page 40

Q. Yeah, regarding what you heard from team members?
A. Yeah, that's all I recall, that a pistol was found. And I -- I don't recall how much timeframe there was in between when I was sitting in the van.
Q. Do they ask that you supplement your voluntary statements?
A. No, ma'am.
Q. About how long do you think it took for an ambulance to arrive?
A. I don't recall exactly the amount of time, but I do know they were there pretty quickly, because I saw the ambulance coming. I was sitting in the van and I remember seeing the lights from the ambulance, but I don't -- I didn't note the time.
Q. Have you ever participated in any other investigations because you shot a suspect?
A. Yes, I have.
Q. When was that?
A. In 2007, another narcotic search warrant.
Q. Were you disciplined?
A. No. I was exonerated.
Q. What were the allegations of that complaint?
A. Discharging a firearm and injuring the suspect.
Q. Did that individual die?

Page 41

A. No, he didn't. He's in prison, life.
Q. Did you see Mr. Bernard doing anything illegal when you came into the home?
A. No.
Q. Did you see anyone in the home doing anything illegal?
A. No.
Q. This -- this case in 2007 where you shot an individual, what are the facts surrounding that shooting?
A. We were executing a narcotic search warrant in the Clear Lake area, where we had a knock and announce, in which we -- we announced our presence before we hit the door. And while knocking on the door, we yelled "Police." And we heard scuffling around inside the apartment. After yelling "Police" several times, we made entry with the battering ram. And I was not running point that day, another guy was, and as we came into the location, the suspect greeted us with a shotgun. He refused to put the shotgun down and attempted to fire a round at my point man, who had a Benelli shotgun as well. And Officer Scott then shot and wounded the suspect. The suspect fell behind a wall, came back out and continued to try to engage us, and that's when I ended up shooting the suspect as well,

Page 42

where he fell down, hit the ground, and the shotgun fell to the ground.
Q. Did you have any mental health training after this incident? I mean, excuse me, treatment, mental health treatment?
A. Yes. We're always required to go see -- after a shooting incident like this, to go to psychological services.
Q. For how long?
A. Until they say we're okay. We can -- we automatically get three days, I believe three days, and then you go to see psychological services and they release you back to work if you're good to go after they talk with you.
Q. So, when you say you were given three days, three days off or three days to treat?
A. Three days off. In those three days, I believe last time I went to the psychological services.
Q. So, within those three days, how many times did you go treat?
A. Just once.
Q. After this incident on March 19th, 2013, did you get mental health treatment?
A. Yes, I went to psychological services again.
Q. And how long did you treat?

Page 43

A. Just one visit.
Q. Have you had any other mental health issues?
A. I've never had mental health issues, ma'am. You just referred to saying I have mental health issues.
Q. About how many warrants do you think you have executed with the -- since you have been in the narcotics division?
A. I don't know the number, but I've been in there since 1999 and have executed well over 100 or more search warrants, if not with my squad, with other squads.
Q. Are there any special skills that you need to be into -- in the narcotics division or do you choose to be?
A. No, you have to apply. You have to demonstrate skills where you can articulate, because we're dealing with suspects that we never -- that we meet on the street to buy dope. You interview, you go through an interview process, and if you pass the interview process, they send you through narcotics survival school, in which you conduct and go through various scenarios of street buys, warrant execution, and different types of training to be able to be in narcotics. And if you make it through narcotic survival school, you're assigned to a squad.

Page 44

And as far as extra training with the AR-15, we had to go through more extensive training with the carbine, running warrants with the AR-15. And we continue monthly. I have to do it monthly.
Q. How long is the school?
A. The narcotics survival? It's two weeks.
Q. And you said there are special -- special skills you have to exhibit. What are those special skills?
A. Well, a lot of it has to do with personality and the ability to be outgoing, being able to meet and talk with people. They call it the gift of gab, I guess, because a lot of people won't -- you know, they question undercover officers all the time, are you the police, and you have to be able to get around that.
Q. Do you all have to have a -- you all have to be able to pay attention to detail?
A. Yes, we do. And depending on situations, but I would say in all police work we have to pay attention to detail.
Q. What is the high risk of not paying attention to detail?
A. It can get you killed.
Q. So you would agree that in the -- the line of work that you're in, paying -- paying attention to

Page 45

detail could cost you your life?
A. Yes.
Q. And you're here testifying that even after you were in fear of your life of a possible weapon that Mr. Bernard had, you didn't check the area around him?
A. A visual inspection, like go after and look for --
Q. In his -- near him.
A. I could see there was nothing around him.
Q. You could see there was nothing around him?
A. Correct. Then I checked his waist band.
Q. But by the time you heard back from other members, they said that there was one near him?
A. Yes, that's what I was told.
Q. And you didn't think that was strange?
A. No. Did you look at that room? That was a horrible room that he fell into. He could have tossed the gun. There's so many possibilities, it's endless.
Q. And do you believe that in -- at the Houston Police Department that telling the truth is -- is a common practice?
A. That's a matter of opinion, but it's supposed to be as part of our coin: integrity, pride. It's part of who we are. It defines us. There are bad apples in the seed though. I mean, you will find a bad apple

Page 46

every once in a while.
Q. Have you ever reported an officer who you know lied?
A. Not that I know of.
Q. Have you ever known an officer to lie?
A. No. I mean, I don't -- about work? I heard them tell lies about other stuff, personal business, but nothing in front of me that would be illegal.
Q. So, in 24 years, you've never heard an officer lie regarding a case?
A. That I was personally in contact, I know, and I've been part of investigations where we caught officers lying, where they were under surveillance, with proactive investigations.
Q. Did you report them?
A. I didn't have to. They were already under -- under -- that was already brought to my attention.
Q. Do you think that HPD has a culture of protecting the officers?
A. No. I think there's a lot of officers that get disciplined and some deserve to get put out and some go to jail and some do, and I agree with every one that -- every one of those that happens that way.
Q. Do you think those officers are trying to protect you when they stated that they found a -- a -- a

Page 47

pistol next to Mr. Bernard although you hadn't seen one?
A. No. In my heart, I firmly believe he had something; otherwise, I wouldn't have pulled the trigger. I don't think my officers are lying for me, the guys in my squad, if that's what you're getting at.
Q. Would you say you did believe they were lying if you did feel that way?
A. State that again.
Q. Would you say you did believe they were lying if you felt that way?
A. No. I mean, it doesn't -- that question doesn't make sense to me. Would I --
Q. I'll rephrase the question for you.
A. Okay.
Q. If you thought the officers were lying about the gun, would you say it, that you thought they were lying?
A. That's a rhetorical question that I can't answer because I don't feel that way.
Q. If you did believe that someone lied about a gun being next to Bernard, would you say that you believed that they were lying?
A. Sure. Sure.
Q. What is the reason why you had your AR-15 and not your 40-caliber in hand?

Page 48

A. Because our AR-15's are what we use for entry, all search warrants. The long gun is up front.
Q. What precautions do you all take when there are elderly people in the home, that you know will be in the home?
A. We don't use a flash bang.
MS. GADSON: Hang on a second.
(Discussion off the record)
MS. GADSON: I pass the witness.
MR. CARNABY: I have no questions. We would like to read and sign.
(Proceedings concluded at 2:33 p.m.)

CHANGES AND SIGNATURE

PAGE LINE CHANGE REASON

_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________



I declare under penalty of perjury that the foregoing is true and correct.

_____________________________
FERDINAND RODRIGUEZ, JR.

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, by the witness, FERDINAND RODRIGUEZ, JR., on this the _____ day of _____________________, _______.

_______________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF __________________

My Commission Expires: __________



STATE OF TEXAS
COUNTY OF HARRIS

REPORTER'S CERTIFICATE

ORAL DEPOSITION OF FERDINAND RODRIGUEZ, JR.

July 13, 2016

I, Laraine L. Toliver, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following facts:

That the witness, FERDINAND RODRIGUEZ, JR., was duly sworn by me and the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(f)(1) signature of the witness:

_____ was requested by the witness or a party before the completion of the deposition and is to be returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefore;

_____ was not requested by the witness or a party before the completion of the deposition.

I further certify that I am neither attorney nor counsel for, related to, nor employed by any parties to the action in which this testimony is taken and, further,



that I am not a relative or employee of any counsel employed by the parties hereto or financially interested in the action.

SUBSCRIBED AND SWORN TO under my hand and seal of office on this the 22nd day of July, 2016.

Laraine L. Toliver
_____________________________
Laraine L. Toliver, CSR 433
Expiration: 12/31/2016
Firm Registration No. 03
ESQUIRE DEPOSITION SOLUTIONS
1001 McKinney Street, Suite 560
Houston, Texas 77002
Tel. 713.524.4600; 713.234.1917